**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 30, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-30598

_____

VICTORIA W,

                                        Plaintiff - Appellant

                        versus

JERRY J LARPENTER, Etc; ET AL,

                                        Defendants

TERREBONNE PARISH CONSOLIDATED GOVERNMENT; DAVE NORMAN, Attorney
for Terrebonne Parish Consolidated Government, in his official and
individual capacities; ED BYERLY, Medical Administrator of
Terrebonne Parish Criminal Justice Complex, in his official and
individual capacities; CHARLES SPENCE, DR, Medical Director of
Terrebonne Parish Criminal Justice Complex, in his official and
individual capacities; UNIDENTIFIED PARTIES

                                        Defendants - Appellees

_____

Appeal from the United States District Court
For the Eastern District of Louisiana

_____

Before HIGGINBOTHAM, STEWART, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This suit has its genesis in the tension inherent in an inmate's right to an abortion and her prison's need to regulate elective medical procedures. Here there is a challenge to the prison's policy of requiring an inmate to obtain a court order to receive an elective medical procedure. It is urged that insisting

1

upon judicial authorization is not reasonably related to a legitimate penological interest. The requirement is further challenged as a product of deliberate indifference to an inmate's right to terminate a pregnancy. Finally, it is urged that there is evidence, at least enough to present a genuine issue of material fact, that the policy was the direct cause of the Plaintiff's injury.

Plaintiff-Appellant Victoria W. asserts that the court order policy frustrated her decision to abort her pregnancy, her constitutional right, and constitutes cruel and unusual punishment through deliberate indifference to a serious medical need. She contends that the policy is not reasonably related to a legitimate penological interest because (1) inmates are often moved without a court order for emergency medical care, so the policy cannot further inmate security ; (2) she would have paid for the procedure and for the costs associated with her custodial release, so no prison resources would have been lost; and (3) there were alternatives to the court order policy. Defendants, the prison officials who applied the policy, reply (1) that the policy is reasonably related to legitimate penological interests, and (2) even assuming the policy is constitutionally impermissible, Victoria cannot show the requisite culpability and causation.

The district court denied Victoria's summary judgment motion and granted summary judgment in favor of the defendants. The court

held, in relevant part, that the policy was reasonably related to legitimate penological interests, and even if the policy was impermissible, Victoria cannot prove the requisite causation. We agree and AFFIRM the district court's summary judgment.

I

The facts are, in large part, undisputed, but because this case comes to us from a summary judgment order, we will view the facts in the light most favorable to Victoria W., the non-movant, and draw all justifiable inferences in her favor.[1]

Plaintiff Victoria W. entered the Terrebonne Parish Criminal Justice Complex on July 28, 1999, after her probation for simple battery was revoked. A physical examination given that day revealed that she was pregnant. Upon informing the medical personnel that she wanted an abortion, she was told that she should meet with the head nurse. Victoria requested the meeting.

Prison officials transported Victoria on various occasions to Chabert Medical Center, a local medical facility, for prenatal care. On July 31, 1999, Victoria complained of back pain, and prison officials transported her to Chabert, where a blood test confirmed her pregnancy. She again informed prison personnel that she wanted to terminate the pregnancy, and she was again informed that she must speak with the head nurse. On August 3, 1999,

---

[1] *United States Steel Corp. v. Darby*, 516 F.2d 961, 962-63 (5th Cir. 1975); *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

3

Victoria received a gynecological examination and was estimated to be around fourteen weeks pregnant. On August 6, 1999, Victoria returned to Chabert for an ultrasound, which showed Victoria's pregnancy to be fifteen weeks and two days along. None of this prenatal care at the local hospital required a court order.

Three days later, on August 9, 1999, the prison's medical administrator, Ed Byerly, was told of Victoria's request for an abortion. He immediately informed the warden of the prison, Joe Null, of the request, who sought the legal advice of William Dodd, the Sheriff's attorney. After speaking with Mr. Dodd, Warden Null informed Byerly that Victoria would need to contact an attorney who could obtain a court order for her release to obtain the abortion.

Byerly and the prison's head nurse met privately with Victoria on August 12, 1999, in Byerly's office. They informed Victoria that she needed to obtain a court order allowing her release and transport to obtain the abortion. The closest facility that could perform an abortion was in New Orleans, about an hour away from the Parish. Byerly allowed Victoria to call her attorney, Howard Marcello, during the meeting.[2] Victoria instructed her attorney to obtain a court order authorizing the abortion. Victoria does not dispute that Byerly explained the court order procedure to Mr. Marcello. Byerly also allowed Victoria to contact various abortion

_____

[2] Victoria testified that she had previously retained Mr. Marcello to represent her daughter in a tort case, but Victoria terminated the representation.

clinics for scheduling and pricing purposes.

Byerly's insistence that Victoria receive a court order to obtain temporary release for the abortion stemmed from the prison's general policy governing elective medical procedures. Although unwritten, it is the policy of the prison that an inmate who wishes to obtain an elective medical procedure must obtain a court order allowing transport or temporary release. By contrast, emergency medical situations that cannot be managed in the prison are transported to a hospital without a court order. The policy governing emergency medical situations enumerates examples, including severe internal/external hemorrhage, loss of consciousness, difficult or labored breathing, heat stroke, chest pains, labor pains less than seven minutes apart, and excessive vaginal bleeding. Inmates seeking an elective medical procedure were always required to get a court order, but Victoria was the first inmate who sought an abortion.

It is undisputed that the abortion was not medically necessary. Victoria sought the abortion for emotional and financial reasons. It is also undisputed that Victoria could not obtain an abortion locally; she would need to be transported to New Orleans. Finally, there is no dispute that because Victoria's pregnancy was so far along, her abortion would require a three-day stay in the New Orleans' abortion clinic.

Over the next week, the prison officials heard nothing from

5

Victoria's attorney. On August 19, 1999, Sheriff's attorney Dodd reiterated the court order policy to Victoria by letter. The letter stated that because the pregnancy did not threaten injury or death,

> it will be necessary for you to contact an attorney so that arrangements can be made with the Correctional Department to have you transferred to a hospital where such a procedure can be performed if legally permissible. Additionally, you should be advised that unless a judge releases you on your own recognizance for such a procedure, you will be responsible for the costs of a guard who has to go and stay with you while the procedure is being performed and during any hospital stay you may incur as a result of this procedure.

Victoria was informed that financial assistance might be available from women's rights groups. Finally, Dodd shared with Victoria his suspicion that her attorney may decline the representation for moral reasons. Dodd cautioned that any problem she had with her attorney "was not the problem of" the prison, the medical staff, or the Sheriff's Office. The letter concludes by again stating the court order policy.

Victoria disregarded the concerns about her attorney, believing that he was working toward obtaining a court order for the abortion. She never informed anyone at the prison that her attorney was balking at the representation.

On the same day, Byerly wrote Warden Null, the Parish President, the Parish attorney and the risk management department

6

to inform them of the ongoing situation. He explained that Victoria had been informed of the court order policy and had contacted her attorney. Byerly noted that the prison had not heard from her attorney and that Victoria would soon be past the time limit for a legal abortion. He explained that Victoria was displeased with the delays. Byerly made clear that the situation was not a moral issue for his department; he was seeking advice on how to proceed considering that the abortion was not a medical emergency.

On August 24, 1999, Byerly responded to one of Victoria's requests for assistance by reiterating the court order policy. Byerly referred her to Dodd's letter of August 19, 1999.

Marcello apparently overcame any reluctance he may have had to the representation. He filed a motion on her behalf, which the judge reviewed and set for hearing on the following day, September 9, 2003. At the time of the hearing, Victoria remained in the allowable time period to receive an abortion. Marcello's motion, however, did not request release or transport in order to obtain an abortion. Rather, it sought Victoria's release from the remainder of her sentence based on an assertion of the prison's inadequate prenatal care.[3] The judge asked if Victoria sought release for

---

[3] During his deposition, Mr. Marcello testified that Victoria asked him for an early release because of the prison's inadequate prenatal care. Victoria disputes this assertion, and we assume the truth of Victoria's assertion for the purpose of our summary judgment review.

7

medical care and then readmission or if she sought an early release. Marcello told the judge that his client sought an early release. The judge then held the motion in abeyance, pending a medical evaluation.

Victoria was transported to the courthouse for the hearing, but neither her attorney nor the judge asked for her to be brought to the courtroom from the holding cell. It was not until she returned to the prison that she learned that her attorney did not ask for a court order for release to obtain an abortion. She spoke with her attorney afterwards and he told her that he did the best he could. He told Victoria that an early release required a doctor to evaluate and inform the court on the prenatal care provided by the prison, and that she would have to pay $1500 for the doctor's services. She told Mr. Marcello that she could not pay for these services.

Although Victoria complains that she was denied access to the telephone when she needed to place calls, she was allowed on various occasions to call her attorney and relatives. Following the court hearing, Victoria submitted requests to prison officials for an early release because of problems with her other children. The requests do not mention her desire for an abortion. The prison responded by simply stating that the prison officials could not change the judge's sentence.

Victoria asserts that the prison officials knew of her desire for an abortion at all times during her incarceration and that her

8

attorney did not contact her or the officials before the hearing. Victoria was released on October 13, 1999, too late to obtain a legal abortion in Louisiana. She carried the child to term and placed it with adoptive parents.

## II

Victoria filed this suit for damages in the Eastern District of Louisiana pursuant to 42 U.S.C. § 1983, alleging violations of her federal and state law rights. She sued Jerry Larpenter, Sheriff of Terrebonne Parish; William Dodd, attorney for the Sheriff; the Terrebonne Parish Sheriff's Office; Joe Null, Warden of the prison; Terrebonne Parish Consolidated Government ("the Parish"); Dave Norman, attorney for the Parish; Ed Byerly, Medical Administrator of the prison; Charles Spence, Medical Director of the prison; and their respective insurers. Victoria sued these defendants in both their individual and official capacities, but the district court granted summary judgment to defendants on all the individual capacity claims. Victoria voluntarily dismissed all claims against the Sheriff's Office, Sheriff Larpenter, Warden Null, and the Sheriff's attorney William Dodd.

Only Byerly, Spence, and Norman in their official capacities, and the Parish remained as defendants. The Parish is thus the only true defendant remaining in the suit.[4]

---

[4] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (explaining that an action against a government official is tantamount to a suit against the government itself); *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) (same); *Ashe v. Corley*, 992 F.2d

9

In supporting her summary judgment motion, Victoria alleged that (1) Defendants promulgated and applied an official policy requiring her to hire an attorney and obtain a court order to obtain an abortion, (2) the official policy violated her Fourteenth Amendment right to an abortion and her Eighth Amendment right to be free of cruel and unusual punishment, and (3) the policy was the moving force of her injury. She asserted that the policy was an undue restraint on her right to an abortion and served no legitimate penological interest in violation of the Fourteenth Amendment. She alleged that the policy was deliberately indifferent to her request for an abortion, which she categorized as a serious medical need, resulting in substantial harm and a denial of her rights under the Eighth Amendment.

In response and in support of its cross-motion for summary judgment, the Parish (1) denied that there was an official policy because Victoria was the first prisoner to request an abortion and such an isolated incident cannot constitute an official policy as a matter of law; (2) denied that any named defendant was a policy maker; (3) asserted that in any event, her attorney, not the policy, frustrated her effort to obtain an abortion; (4) urged that an abortion is not a serious medical need under the Eighth Amendment; and (5) maintained that such a policy was constitutional under the Fourteenth Amendment because it was reasonably related to

---

540, 541 n.1 (5th Cir. 1993) (same).

legitimate penological objectives, namely inmate security and avoidance of liability.

The district court granted summary judgment for the Parish, concluding that Victoria was not deprived of a federal constitutional right. The court found that there was an official policy that was reasonably related to legitimate penological interests. The court also held that Plaintiff failed to present a fact issue on the question of causation, concluding that it was her attorney's actions, not the policy, that deprived Victoria of her opportunity to have an abortion. Finally, the court held that a non-therapeutic abortion did not qualify as a "serious medical need" for purposes of the Eighth Amendment. The court dismissed Victoria's federal claims with prejudice and dismissed her state law claims without prejudice, choosing not to retain jurisdiction over the state claims.

Victoria appeals the adverse judgment. She presents the same arguments she made below, adding that the district court erred in granting summary judgment to Byerly, Spence, and Norman in their individual capacities because the law was clearly established and Defendant's actions were objectively unreasonable. We review the summary judgment order *de novo*.[5]

### III

Section 1983 provides that "[e]very person who, under color of

---

[5] *Johnson v. Louisiana*, 351 F.3d 616, 621 (5th Cir. 2003).

any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."[6]  There are three elements to establish liability through a Section 1983 action.[7]  There must be (1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor.[8]  "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."[9]

The relevant rules are well established.  Municipalities are "persons" within the meaning of § 1983.[10]  They are liable only for their own acts and not those attributed to them by principles of *respondeat superior*.[11]  The language and legislative history of § 1983 "compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official

---

[6] 42 U.S.C. § 1983.

[7] *Bush v. Viterna*, 795 F.2d 1203, 1209 (5th Cir. 1986).

[8] *Id.*

[9] *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) (en banc).

[10] *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690 (1978).

[11] *Id*. at 691-92.

municipal policy of some nature caused a constitutional tort."[12] Additionally, a § 1983 plaintiff must demonstrate that—

> the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.[13]

Causation bears on implementing the rule against attributed liability under § 1983, insisting as it does that the local government unit itself be the actor. Indeed, the first inquiry in a municipal liability case is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."[14] It follows that when the claim is that while a municipal policy itself did not violate federal law, it caused another actor to inflict the injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[15]

At issue here are the rights to an abortion and to be free of cruel and unusual punishment. The Fourteenth Amendment protects a woman's right to choose to terminate her pregnancy prior to

---

[12] *Id*. at 691.

[13] *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997); *see also Piotrowski*, 237 F.3d at 578 & n.17.

[14] *Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[15] *Bryan County*, 520 U.S. at 405.

viability.[16] Government regulation of abortions is allowed so long as it does not impose an undue burden on a woman's ability to choose.[17] A state regulation constitutes an undue burden if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[18]

The Eighth Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, proscribes cruel and unusual punishment.[19] The original aim of the Eighth Amendment was to proscribe inhuman techniques of punishment.[20] The Court has extended it to encompass "broad and idealistic concepts of dignity, civilized standards, humanity, and decency."[21] In *Estelle v. Gamble*, the Court held that prison officials inflict cruel and unusual punishment if they are deliberately indifferent to an

---

[16] *Roe v. Wade*, 410 U.S. 113, 153 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846 (1992).

[17] *Casey*, 505 U.S. at 874 ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.").

[18] *Id*. at 877.

[19] U.S. CONST. amend. VIII.

[20] *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878).

[21] *Estelle*, 429 U.S. at 102 (*quoting Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).

inmate's serious medical needs.[22]  "Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."[23]  Not all inadequate medical treatment rises to the level of an Eighth Amendment violation; "[i]t is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."[24]  A plaintiff must prove "objectively that he was exposed to a substantial risk of serious harm," and that "jail officials acted or failed to act with deliberate indifference to that risk," which requires actual knowledge and deliberate disregard.[25]

These constitutional rights are clear.  It is equally clear that when asserted by a prisoner, their scope necessarily reflects the prison context.  "Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner.  An inmate does not retain rights inconsistent with proper incarceration."[26] The Court has established an analysis appropriate to the unique circumstances and difficulties of imprisonment in deciding whether a prison regulation impermissibly limits a prisoner's

---

[22] *Id*. at 103-04.

[23] *Id*. at 104.

[24] *Id*. at 106.

[25] *See Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002).

[26] *Overton v. Bazzetta*, 123 S. Ct. 2162, 2167 (2003).

constitutional rights.[27]  In *Turner v. Safley*, the Court balanced two principles in determining the proper standard of review.[28]  On the one hand, the Court recognized that certain constitutional rights survive incarceration.[29]  On the other hand, the Court recognized that federal courts are ill-equipped at prison administration and reform and that these tasks are generally left to the legislative and executive branches.[30]  In balancing these two considerations, the Court created a standard for evaluating "prisoner rights" cases: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[31]

We are to consider four factors in determining whether a regulation is reasonably related to a legitimate penological interest:[32] (1) "whether the regulation has a valid, rational connection to a legitimate government interest;"[33] (2) "whether

---

[27] *Turner v. Safley*, 482 U.S. 78, 85 (1987) ("Our task . . . is to formulate a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.") (internal quotation marks omitted).

[28] *Id*. at 84-85.

[29] *Id*. at 84.

[30] *Id*. at 84-85.

[31] *Id*. at 89.

[32] *Id*. at 89-91.

[33] *Overton*, 123 S. Ct. at 2168.  *Turner* explained that the logical connection between the regulation and the goal must not be

alternative means are open to inmates to exercise the asserted right;" (3) "what impact an accommodation of the right would have on guards and inmates and prison resources;" and (4) "whether there are 'ready alternatives' to the regulation."[34] The Court explained that this final factor is not a "least restrictive means" test; to prove a regulation unreasonable, an inmate must present evidence of a ready alternative that fully accommodates a prisoner's rights at *de minimis* cost to valid penological interests.[35] It is the inmate's burden to disprove the validity of the regulation.[36]

Applying these factors, the *Turner* Court held that a rule barring inmate-to-inmate correspondence was reasonably related to legitimate security interests, but restrictions on marriage were not.[37] The prison's ban of inmate-to-inmate correspondence was logically connected to the legitimate security concern of curtailing escape plans, assaults, and gang activity. The Court explained that the regulation applied only to other inmates within Missouri prisons, that the asserted right would have a significant effect on other inmates and prison personnel, and that there was no

---

so remote that the policy is arbitrary and capricious. *Turner*, 482 U.S. at 89-90.

[34] *Id.*

[35] *Turner*, 482 U.S. at 91.

[36] *Overton*, 123 S. Ct. at 2168.

[37] *Turner*, 482 U.S. at 91-93.

evidence of an obvious, easy alternative to the regulation.[38] Accordingly, the Court held that because the regulation was reasonably related to a legitimate penological interest, it did not unconstitutionally burden the prisoners' First Amendment rights.

In contrast, the Court held that a regulation prohibiting inmates from marrying unless the warden found compelling reasons to allow the marriage unconstitutionally burdened inmates' fundamental right to marry.[39] The prison argued that the regulation was reasonably related to legitimate penological interests, avoiding violent love triangles and supporting the rehabilitation of female inmates who were overly dependent on males.[40] Plaintiffs presented evidence demonstrating why the policy did not serve the alleged penological interests. The prison officials, however, presented no evidence that (1) alternatives to complete prohibition could not satisfy the security concerns, (2) the regulation was logically connected to the prevention of caustic love triangles, (3) the asserted right would adversely affect other inmates and prison officials, or (4) the regulation would prevent rehabilitation.[41] As a result, the Court held the marriage regulation facially

---

[38] *Id.*

[39] *Id.* at 97–99.

[40] *Id.* at 97.

[41] *Id.* at 98–99.

invalid.[42]

The Court has found valid various prison regulations that burdened prisoners' rights under the First Amendment,[43] Fourth Amendment,[44] Eighth Amendment,[45] and Fourteenth Amendment[46] because the regulations were reasonably related to legitimate penological interests.

## IV

We are persuaded that the policy of requiring judicial approval of elective medical procedures is here reasonably related to legitimate penological interests. The policy was not promulgated with deliberate indifference to its consequences and was not the direct cause of Victoria's injury.[47]

---

[42] *Id*. at 99.

[43] *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129-31 (1977); *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (cited with approval in *Turner*).

[44] *Bell v. Wolfish*, 441 U.S. 520, 556-62 (1979).

[45] *Overton*, 123 S. Ct. at 2170.

[46] *Block v. Rutherford*, 468 U.S. 576, 588 (1984) (holding prison's policies of denying contact visits to pretrial detainees and random shakedown searches of cells to not violate due process because of valid, rational connections between the regulations and security).

[47] Because Plaintiff has not shown a federal rights deprivation, as we will explain, we need not reach Victoria's argument regarding the district court's decision to grant the individual defendants' qualified immunity. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Steadman v. Texas Rangers*, 179 F.3d 360, 367 n.9, 369 (5th Cir. 1999).

There is no material dispute that Victoria has shown the first two elements of municipal liability – an official policy implemented by policy makers. The district court concluded without difficulty that Victoria demonstrated these elements.[48] Defendants make no serious challenge to these findings on appeal, and we assume them to be present.

A

1

There is no material challenge to the general policy requiring inmates to obtain court orders allowing elective medical procedures, defended here as an effort to ensure inmate security and avoid unnecessary liability. These are legitimate government interests.[49] There is a valid, rational connection between these

---

[48] The district court explained:
> The Court has little trouble concluding that the court order policy at issue in this case constitutes an official policy . . . for section 1983 purposes. . . . Sheriff Larpenter acknowledges that "[i]t is an unwritten policy that when an inmate requests elective surgery, the inmate is advised to seek permission from the District Court, either *pro se* or through counsel, by filing the appropriate documents to obtain an order setting forth the parameters for the procedure, <u>i.e.</u>, who will pay the guards, if necessary, where the procedure will be performed, etc."

The Court also found that the medical staff, through Ed Byerly, was complicit in executing the policy.

[49] *Block v. Rutherford*, 468 U.S. 576, 586 & n.8 (1984) (finding that internal security of detention facilities is a legitimate government interest); *Wilson v. State*, 576 So. 2d 490, 493 (La. 1991) (holding that a custodian of a prisoner may be held liable for injuries caused by an escaped prisoner if the escape results

20

interests and a policy requiring prisoners to obtain a court order allowing non-emergency medical procedures performed outside of the prison. The policy secures a focus upon each off-site transport for elective procedures, transfers which place the prisoner in a less-secure environment and increase the chance of escape. The transfers also require prison officials to escort the prisoner to the medical facility, some of which are an hour away in New Orleans, reducing prison resources and decreasing internal security. Finally, under Louisiana law, the Parish is exposed to liability claims arising from the acts of escaped prisoners.[50] To minimize the risks posed by non-emergency off-site transfers, there is nothing unreasonable in the Parish's insistence upon judicial approval.[51] The policy places an unbiased judge between the prison officials and inmates seeking off-site transport for purely elective procedures.

Elective treatment is not prohibited, although not available within the prison. Rather, an inmate can receive the treatment by following a set procedure. Warden Null testified that scheduling a hearing and receiving a court order are not difficult in the

---

from the negligent management of the prison).

[50] LA. REV. STAT. § 15:811(A) (authorizing the sheriff to release prisoners in limited circumstances); *Wilson*, 576 So. 2d at 493.

[51] *See Overton*, 123 S. Ct. at 2168-69 (policy decreasing the total number of visitors and thereby minimizing possibility of misconduct and effect on prison resources was rationally related to internal security).

Parish.  That assertion is born out by the facts of this case;
Victoria's lawyer filed a motion that was reviewed by a judge and
set for hearing on the following day - all within the time for a
legal abortion.

2

Viewing the policy as applied to Victoria, it remains
reasonably related to legitimate penological interests.  Victoria
asserts various reasons why the policy serves no legitimate
penological interest, but they alone or in sum do not prove the
policy unreasonable under *Turner*.

First, Victoria notes that she was repeatedly released from
the prison without a court order for other medical care, and there
is no evidence that security concerns are greater for an abortion
than for regular medical care.  This assertion does not account for
the distinction between required medical care, like the prenatal
care provided Victoria, and elective medical procedures.[52]  The

---

[52] It is clear that Victoria believes that any desired
abortion, regardless of the reason, is an emergency medical
situation.  As a result, Victoria does not believe a policy
governing elective procedures should have applied to her.  However,
while an abortion is time-sensitive and unique in its
constitutional protection, a non-therapeutic abortion is not a
medical emergency.  The prison reserves emergency transport for
conditions such as heart attacks, severe hemorrhaging, and labor
pains less than seven minutes apart.  A woman's desire for a non-
therapeutic abortion does not fit this category. Victoria presents
no reason why a non-therapeutic abortion must qualify as an
emergency.  The constitutional right to choose to abort one's
pregnancy does not necessarily categorize it as an emergency.
Accordingly, the Parish was reasonable in applying the court order
policy to Victoria.

22

policy aims to reduce the total number of off-site transports and thereby reduce the effects on prison resources, inmate security, and potential liability. Victoria's assertion also ignores the fact that her prenatal medical care could be handled locally, while her abortion could only be handled over an hour away in New Orleans during a three-day stay. Requiring a court order for an elective procedure that requires a round trip to and three-day stay in New Orleans is reasonable.

Second, Victoria contends that the prison would have lost no resources by transporting her to the abortion clinic because Victoria was willing to pay for the procedure and the cost of the guard. This fact mitigates one concern underlying the policy - the resources lost by the prison - but it ignores the fact that the prison is still either short-handed or out the cost of added personnel. It also forgets that the policy's simple means of reducing potential liability of the Parish is avoiding unnecessary transports.

Third, Victoria maintains that contrary to the finding of the district court, there were alternatives available other than the court order policy. She claims, for example, that the Parish could simply have modified the policy to exclude abortions. But this fact is not dispositive; as the Court has noted, *Turner* does not provide a "least restrictive means" test.[53] The burden is on

---

[53] *Turner*, 482 U.S. at 90-91.

23

Victoria to show "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests."[54] Her alternative does not account for the avoidance of liability attained by transporting prisoners for elective procedures only by court order. She concedes that her alternative would not even allow the prison to require a release of liability before transporting an inmate for an abortion. In any case, a ready alternative is only some evidence affecting the reasonable relationship standard; it is not dispositive.[55] Here the policy is rationally connected to the legitimate penological objectives served - inmate security, avoidance of liability, and prison resources. It is neither arbitrary nor irrational.

Finally, Victoria relies heavily on *Monmouth County Correctional Institutional Inmates v. Lanzaro*,[56] which held that a similar court order policy was not reasonably related to a legitimate penological interest. *Monmouth*, however, rested on different facts than this case. The prison in *Monmouth* had a specific policy governing abortions that were not medically necessary.[57] The policy required inmates who wanted a non-therapeutic abortion to first acquire a court order releasing the

---

[54] *Id*. at 91; *Overton*, 123 S. Ct. at 2167-68.

[55] *Turner*, 482 U.S. at 91.

[56] 834 F.2d 326 (3d Cir. 1987).

[57] *Id*. at 328.

inmate on her own recognizance.[58] A court order allowing supervised release was not an option.[59] The prison did not subject any other forms of elective medical care to the court order policy; "rather, it appears to be an option created solely to address inmate requests for elective, nontherapeutic abortions."[60] The plaintiffs claimed that the court order policy impermissibly impeded their freedom to choose an abortion and constituted cruel and unusual punishment.[61] They sought a preliminary injunction barring the enforcement of the court order policy, which the district court granted. The Third Circuit reviewed the facts to determine whether the plaintiffs demonstrated a reasonable probability of eventual success in the litigation.[62]

Following oral argument in *Monmouth*, the Supreme Court issued *Turner*, which the *Monmouth* court applied. The sole government interest asserted by the county was the "unspecified, yet insurmountable, administrative and financial burdens [that] will result if the County is required to provide access to and funding for elective, nontherapeutic abortions."[63] The court found this

---

[58] *Id*. at 334.

[59] *Id*. at 334–35.

[60] *Id*. at 335.

[61] *Id*. at 329, 334.

[62] *Id*. at 332–33.

[63] *Id*. at 336 (internal footnotes omitted).

unspecified assertion was not a legitimate government interest because "courts have been reluctant to consider costs to the institution a major factor in determining whether a constitutional violation [exists]."[64] Because the only interest asserted was economic, the court refused to recognize it as a legitimate interest and found the policy unreasonable under *Turner*.[65] The court went on to find that even assuming a legitimate government interest, the policy was impermissible nonetheless because it was not reasonably related to a legitimate penological interest. The court explained that the policy focused on the nature of the treatment and not on the gravity of any security risk.[66] As such, the court held the policy to be an impermissible burden on a woman's right to choose an abortion.

The facts of this case deal with a materially different policy, government interest, and penological concern. While the policy in *Monmouth* applied only to abortions, the policy at issue here governs all elective medical procedures. The *Monmouth* policy required inmates to get a court order releasing them on their own recognizance, making it more difficult for full-security inmates to obtain an order of release. But the Parish's policy leaves the decision to the inmate and her attorney; an inmate may seek an

---

[64] *Id.*

[65] *Id.* at 337.

[66] *Id.* at 338.

order granting a custodial release. Critically, the options allowed by the Parish's policy, unlike the policy in *Monmouth*, ensure that a pregnant inmate who wants an abortion will obtain a court order.

Furthermore, the county in *Monmouth* alleged only monetary and administrative burdens as the legitimate government interests supporting the policy; here, by contrast, the policy seeks to ensure inmate security and avoid unnecessary liability. There is no dispute that inmate security and avoidance of liability are legitimate government interests; the only question is whether these interests are reasonably related to the policy. In *Monmouth* the court did not find a rational relationship because, among other things, other prisoners were transported for elective care without a court order. The unequal application of the policy made it arbitrary and irrational. But the Parish's policy does not focus on the nature of the treatment; instead, it seeks a judicial screen of prisoner transports for elective medical care, with its attendant focus on a disinterested decision. The policy's aim is to maximize inmate security and avoid liability. Nothing suggests that its purpose or effect was to deter abortions. We are not persuaded that *Monmouth* controls this case.

To the contrary, because the policy is reasonably related to legitimate penological interests, we find that it was constitutionally permissible.

An otherwise innocuous municipal policy will support liability if it is promulgated with deliberate indifference to its known or obvious consequences.[67] If deliberate indifference is shown, Victoria must also show a direct link between the policy and her injury. As the policy itself does not violate federal law, "rigorous standards of culpability and causation must be applied"[68] to ensure that the Parish is not held liable for the acts of others. The facts of the case demonstrate that Victoria cannot meet either of these burdens.

Victoria contends that because the prison officials knew she wanted an abortion and continued to implement the policy, they were deliberately indifferent to her constitutional rights, and that but for the policy, she would have received an abortion.

As often noted, demonstrating deliberate indifference to prove municipal liability is not easy.

> Deliberate indifference of this sort is a stringent test, and "a showing of simple or even heightened negligence will not suffice"

---

[67] *Bryan County*, 520 U.S. at 406-07; *Piotrowski*, 237 F.3d at 579-80; *Bryant v. Maffucci*, 923 F.2d 979, 986 (2d Cir. 1991) (explaining that for prisoner to prevail on § 1983 claim alleging unconstitutional policy that violated her right to an abortion, prisoner must show that the policy was deliberately indifferent to her rights and that city made a deliberate choice that was the moving force behind the violation).

[68] *Bryan County*, 520 U.S. at 405.

to prove municipal culpability.[69]

Deliberate indifference here is an objective standard.[70]  For example, continued adherence to an officer training program that has proven inadequate in preventing tortious conduct may establish deliberate indifference.[71]

On these facts, there is no deliberate indifference.  Far from illustrating a continued adherence to a policy that has violated constitutional rights in the past, the policy and the Defendants' actions in this novel situation demonstrate effort to respond to Victoria's medical needs.  She received prenatal care three times during the first nine days of her imprisonment, confirming her pregnancy and providing the details necessary to properly evaluate the situation.  Byerly wrote the Warden explaining the situation and asking for guidance on the Monday following Victoria's August 6 ultrasound.  The Warden contacted the Sheriff's attorney, and then informed Byerly that Victoria needed to obtain a court order.  Once Byerly knew the protocol, he arranged a meeting in his office with Victoria, the prison's head nurse, and himself.  He explained the court order policy to Victoria.  He allowed her to use his telephone to call her attorney.

---

[69] *Piotrowski*, 237 F.3d at 579 (*citing Bryan County*, 520 U.S. at 407).

[70] *Canton*, 489 U.S. at 390; *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994).

[71] *See Canton*, 489 U.S. at 390 & n.10.

When her attorney appeared confused by Victoria's request, Byerly spoke directly to her attorney and explained the policy to him. Because there were no abortion clinics in the Parish and because the prison could not itself perform the abortion, Byerly gave Victoria access to directories and a phone to enable her to locate and call various abortion clinics in New Orleans to shop price and service availability. When Byerly heard nothing from Victoria's attorney, he again notified the Warden and noted that the situation was time-sensitive. The Sheriff's attorney wrote a letter to Victoria and the Warden personally delivered it to her. The letter told Victoria that the prison had not heard from her attorney and reminded her of the need for a court order. It went further, alerting Victoria to the possibility that her attorney might be having moral qualms about the representation. Victoria was allowed to telephone her attorney and make the necessary arrangements. Four days later, Byerly again reminded Victoria of the policy.

Victoria's attorney filed a motion, which the judge reviewed and set for hearing the next day on September 9, 1999, well within the legal time period for obtaining an abortion. Prison officials transported Victoria to a holding cell at the courthouse, although neither the judge nor her attorney asked for her to be brought to the courtroom.[72] Despite Victoria's request of her lawyer, he did

---

[72] There is no allegation of collusion between the Parish and Victoria's attorney.

30

not ask for a court order releasing Victoria for an abortion. Rather, he asked for an early release due to inadequate prenatal care. This was the attorney's choice, not the Parish's. The judge testified that if the attorney had asked that Victoria be present, he would have allowed it. The judge also testified that he asked Mr. Marcello whether the motion was for an early release or for a temporary release for medical care, and Mr. Marcello stated that the motion was for an early release. There is no evidence that the court would have denied Victoria's motion to receive a medical procedure to which she had a constitutional right. But the judge did not have the chance to rule on such a motion because the attorney chose instead to seek an early release. The Parish's policy, being a condition of Victoria's incarceration, burdened her access to an abortion, but the policy functioned properly and the balance was reasonable.

These facts demonstrate that the Parish did not promulgate its policy with deliberate indifference to its known or obvious consequences. This was the first time an inmate requested an abortion in the Parish. The prison officials and medical staff reasonably applied the policy. The various communications and meetings show that the prison assisted Victoria in navigating the policy, and she did so successfully.

The facts also preclude a showing that the policy was the direct cause of her injury. That the policy itself was reasonable, as we have explained, in turn affects the question of causation.

31

But regardless of the policy's requirements, it functioned properly in this case. Her attorney's action, not the policy, denied Victoria an abortion.

In her summary judgment motion below and in her causation argument here, Victoria focuses upon traditional tort law. Although tort principles inform our causation analysis, her reasoning ignores the uniqueness of municipal liability for claims against instruments of local government brought under § 1983. Causation analysis for municipal liability must accommodate the insistent rule that the local government unit be the actor; it must not be held liable under *respondeat superior*. The facts of this case show that the policy was reasonable and the frustration of Victoria's choice to abort was neither predictable nor the policy's doing. Victoria's appeal to Louisiana tort law misses the mark.

V

We conclude that on facts about which there is no genuine dispute, insisting upon judicial authorization and providing prompt access to it was reasonably related to legitimate penological interests. The requisite culpability and causation have not been sufficiently shown. The policy was reasonable and causation is not present. The claims must fail and we must affirm the summary judgment in favor of Defendants.

AFFIRMED.