# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 9, 2009

Charles R. Fulbruge III
Clerk

No. 08-30061

KALEEM ARSHAD, Dr., Individually and on behalf of decendent, Dr.
Jameela Arshad; NADEEM S ARSHAD, Individually and on behalf of
decendent, Dr. Jameela Arshad,

                            Plaintiffs - Appellants,

v.

NICK CONGEMI, in his capacity as Chief of Police for the City of Kenner;
KENNER CITY; KENNER POLICE DEPARTMENT; GERALD MILLER,
Officer; RYAN KRUMMEL, Officer; KIMBERLYN BRIGHT, Officer; EMILE
SANCHEZ, Sergeant; GEMINI INSURANCE COMPANY; CLARENDON
AMERICA INSURANCE COMPANY,

                            Defendants - Appellees.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-CV-59

---

Before JOLLY, DAVIS, and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

The Plaintiffs-Appellants, Dr. Kaleem Arshad and Nadeem S. Arshad ("the

Arshads"), appeal from the district court's grant of summary judgment in favor

of the Defendants-Appellees, dismissing with prejudice the Arshads' federal

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

claims and certain state law claims and dismissing without prejudice the Arshads' remaining state law claims.

## I. FACTS

On January 10, 2005, at approximately 10:00 p.m., Dr. Jameela Arshad, a black female and licensed physician, was driving in New Orleans near the intersection of Williams Boulevard and West Esplanade when she witnessed a vehicle strike a young boy on a bicycle. She stopped her vehicle and went to the boy's side. Another civilian in plain clothes arrived at the scene about the same time—Robert Evans, a white male claiming to be an emergency medical technician ("EMT"). In an apparently heated exchange, Evans asked to see Dr. Arshad's credentials, and she informed him that she was a physician and that it was "her scene."

The next person to arrive on the scene was Officer Ryan Krummel, an off-duty Kenner Police officer. Dr. Arshad informed him, too, that she was a physician and that it was "her scene." Officer Krummel testified that Evans told him Dr. Arshad did not have any proof that she was a physician. Officer Krummel also testified that he told Evans and Dr. Arshad not to touch the boy, but, while he didn't know "if she was going to render aid or grab the juvenile, . . . [Dr. Arshad] made attempts, or motions, towards the juvenile."

Next, Kenner Police Officer Gerald Miller reported to the scene and did not note anything unusual on his arrival. He recognized Officer Krummel but not Evans or Dr. Arshad. Officer Miller testified that Evans immediately informed him that Dr. Arshad claimed she was a physician but would not present her credentials. Officer Miller asked Dr. Arshad to present them, but she said she did not have them with her. Officer Miller then told her that she could not touch the boy and repeatedly ordered her to step away from the scene, but she refused and became increasingly agitated. No one asked Evans for his credentials at any point, and Officer Miller admitted that he never told Evans to step away.

Dr. Arshad turned back to the boy and attempted to place her hands on him. Officer Miller testified that he "didn't know what her intentions were" but "never saw her trying to harm the patient." Officer Miller then grabbed her arm, claiming in later testimony that she had committed the crime of "failure to obey lawful orders" and was possibly "attempting to commit a battery on the victim." Dr. Arshad physically resisted Officer Miller, pulled away from him, and turned back to the boy.

Officer Miller then pulled her away from the boy again, and a scuffle ensued. When Dr. Arshad continued to struggle, Officer Miller swept her legs out from under her, pinned her to the ground face-first, knelt on her back, and cuffed her hands behind her back. Dr. Arshad reportedly became calm and complacent immediately after being handcuffed. Officer Miller then placed her in the back of a police cruiser of Officer Kimberlyn Bright, who had recently arrived on the scene. She was locked in the car alone with the windows rolled up, and at least one witness reported that she began kicking at some point after being placed in the car.

Both Officers Miller and Bright (who had the only set of keys to the car) walked away from the locked car. Several minutes later, Officer John Louis was passing by Officer Bright's car and noticed that Dr. Arshad appeared to be foaming at the mouth. Thinking she had been pepper-sprayed, he began asking other officers who had done so. Someone radioed Officer Bright, who returned from across the street to unlock the car. It is unclear how much time had passed between the time Dr. Arshad was placed in the car and when she received medical attention, but evidence suggests between five and nine minutes passed. She was removed from the car as soon as it was unlocked, but she was unresponsive, and attempts to revive her were unsuccessful. The cause of death was later determined to be a cardiopulmonary arrest.

In this suit, commenced January 6, 2006, the Arshads, Dr. Arshad's surviving husband and son, sued Nick Congemi, in his official capacity as Chief of Police for the City of Kenner; the City of Kenner; Kenner Police Department; Gemini Insurance Company; and Clarendon America Insurance Company (collectively, "the City"). The Arshads also sued Officers Miller, Krummel, and Bright; Sergeant Emile Sanchez,[1] and Robert Evans ("the individual defendants"), all in their individual capacities.

The Arshads asserted state law tort claims and federal claims against the individual officers and Evans under 42 U.S.C. § 1983 for violating Dr. Arshad's Fourth, Eighth, and Fourteenth Amendment rights, specifically relating to the alleged false arrest, use of excessive force, and cruel and unusual punishment (deliberate indifference). They also asserted § 1983 claims against the City based on an alleged custom or policy of arresting licensed physicians at the scene of accidents without probable cause.

On October 15, 2007, following their answers which asserted qualified immunity, the defendants filed motions for summary judgment. Evans argued that he had not acted under color of state law and so was not subject to a § 1983 action, nor was he liable under the tort claims. The City and the other individual defendants argued that (1) the arrest of Dr. Arshad had been lawful and had not violated her constitutional rights; and (2) the Arshads had failed to show a custom or policy in place that led to a violation of her constitutional rights.

At a hearing on December 12, 2007, the district court granted the defendants' motions, as formalized in a December 13, 2007 written judgment. The court granted summary judgment on all § 1983 claims against the individual defendants based on qualified immunity. The court specifically found

---

[1] Sergeant Sanchez, the ranking officer, arrived on the scene of the accident after Dr. Arshad had been locked in the car. His role was limited and is not separately discussed.

that Dr. Arshad's rights with respect to excessive force and deliberate indifference had not been violated, but it made no such determination on the right to be free of false arrest. The court also granted summary judgment on the *Monell* claim against the City after it determined the Arshads' evidence was insufficient to show a custom or policy.

In addition to dismissing the § 1983 claims against Evans, the court dismissed the state law tort claims against him with prejudice; as a result, no claims against Evans remain. With respect to the remaining state law claims against the other defendants, the court declined to exercise supplemental jurisdiction and dismissed those claims without prejudice.

The Arshads now appeal, attacking the dismissal with prejudice of the federal claims and the dismissal without prejudice of the state law claims against the defendants other than Evans. The Arshads do not attack the dismissal with prejudice of the state law claims against Evans.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over the § 1983 claims under 28 U.S.C. § 1331, and jurisdiction over the supplemental state law claims under 28 U.S.C. § 1367. We have jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

"We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court." *Environmental Conservation Organization v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008) (citing *Greenwell v. State Farm Mut. Auto. Ins. Co.*, 486 F.3d 840, 841 (5th Cir. 2007)). *See* FED. R. CIV. P. 56.

## III.  LAW AND ANALYSIS

### A.  § 1983 Claims

The district court dismissed all of the § 1983 claims against the individual defendants based on qualified immunity.  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

> Whether a government official is entitled to qualified immunity "generally turns on the 'objective reasonableness of the action' assessed in light of the legal rules that were 'clearly established' at the time it was taken."  The law is deemed to be clearly established if the contours of a right asserted are sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . *If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity.*  Whether the conduct of which the plaintiff complains violated clearly established law is an essentially legal question.

*White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992) (citations omitted) (emphasis added).  "It is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198–200 (2004) (quotation marks omitted).

More concretely: "To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident.  We review the district court's grant of qualified immunity de novo." *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008) (footnote omitted).  We have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 818 (2009).

*False Arrest*

Under the first part of the qualified immunity test, "[t]he right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994). "For warrantless arrests, the test for whether the 'police officer ha[d] probable cause to arrest [is] if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime.'" *Id.* (quoting *Duckett v. City of Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992)).

> Police officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S. at ----, 112 S.Ct. at 536 (quoting *Anderson* [*v. Creighton*], 483 U.S. at 641, 107 S.Ct. at 3040). . . . Similarly, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).
>
> * * *
>
> The subjective beliefs of [the officers] as to what facts they relied upon in forming the probable cause to arrest . . . are irrelevant to the objective reasonableness of their actions. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040. The issue here is an "objective (albeit fact-specific) question whether a reasonable officer could have believed" that he was violating a person's constitutionally protected rights under the circumstances of the complained of action. *Id.* For this reason, we have held that "[e]ven if there was not probable cause to arrest the plaintiff for the crime charged, proof of probable cause to arrest the plaintiff for a related offense is also a defense" to a false arrest section 1983 claim. [*Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)].

*Id.* at 1017.

The district court did not specifically find that Officer Miller actually had probable cause to arrest Dr. Arshad. The court's finding of qualified immunity was premised on its determination that Officer Miller was not objectively

7

unreasonable in concluding that there was probable cause. We agree. Although the scene appeared normal when Miller first got there, the situation quickly escalated when Officer Miller ordered Dr. Arshad, dressed in plainclothes, to present identification. Dr. Arshad repeatedly refused to move; refused to present identification; became agitated; insisted several times that it was her scene; and attempted to place both hands on the boy. Only after all of that had occurred did Officer Miller grab her arm, effecting an arrest. Miller later testified that he thought she may have been about to commit a battery on the boy. Even if he ultimately lacked probable cause, it is hard to say that his belief is objectively unreasonable in light of the chaos of the accident scene.

Moreover, although not argued by the Defendants-Appellees, a reasonable officer could have believed there to be probable cause under a Louisiana criminal statute which provides, in relevant part: "Interference with medical treatment is the intentional and willful interference with a[n] . . . emergency medical technician . . . in the performance of their duties relating to the care and treatment of patients . . . at the scene of a medical emergency." LA. REV. STAT. ANN. § 14:332(A) (2005). Assuming a reasonable officer could have believed that Evans—who was not in a medical uniform or presenting identification, but who was holding the boy's head and otherwise acting as if he was in control—was an EMT and that Dr. Arshad was simply an unidentified stranger interfering with the boy's medical treatment, this statute could conceivably give rise to probable cause.[2]

---

[2] That this statute may constitute a misdemeanor with a "fine-only" penalty upon first violation is irrelevant for the probable cause determination. The Supreme Court has held that, even with respect to misdemeanors, officers are "authorized (not required, but authorized) to make a custodial arrest without balancing costs and benefits or determining whether or not [the] arrest was in some sense necessary." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). The Court specifically rejected any distinction between "jailable" and "fine-only" offenses. *Id.* at 348–49.

In short, in light of the chaos of the scene and Dr. Arshad's refusal to present identification, a reasonable officer could have concluded that probable cause existed to arrest her. Thus Officer Miller and the other individual defendants are entitled to qualified immunity on the false arrest claim.

*Excessive Force*

The Supreme Court discussed claims of excessive force in both *Graham v. Connor*, 490 U.S. 386 (1989), and *Saucier v. Katz*, 533 U.S. 194 (2001), firmly establishing that we examine the objective reasonableness of the officer's actions not with the benefit of hindsight but in light of the "on-scene perspective" of the officer. *Saucier*, 533 U.S. at 205 (citing *Graham*, 490 U.S. at 393, 396, 397).

> To determine the objective reasonableness of an officer's use of force, "[w]e pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'" *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998) (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

*Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005).

As the Supreme Court recognized in *Saucier*, "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205. "Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force,' *Priester v. Riviera Beach*, 208 F.3d 919, 926–927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206.

The Arshads argue that the arrest was unlawful and that the use of any force was therefore excessive. However, we have already found that Officer Miller was objectively reasonable in believing probable cause existed to arrest Dr. Arshad. Thus, we must determine whether the use of force was excessive or objectively unreasonable in light of that objectively reasonable arrest. It is undisputed that Dr. Arshad forcibly resisted Officer Miller after he grabbed her arm. Under *Graham*, we must consider the fact that Dr. Arshad was resisting arrest.

We must also consider the fact that Dr. Arshad suffered only minor, superficial injuries, such as scrapes, in the forcible arrest itself. She calmed down as soon as she was handcuffed and was able to walk and talk on her way to being put in the police car. It was only in the police car several minutes after her arrest that Dr. Arshad suffered a cardiopulmonary arrest. Even if we were to draw a connection between those two events, we must focus on the force Officer Miller actually used, not just on the ultimate consequence, as illustrated by *Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008).

In *Gregory*, the Ninth Circuit found that police officers had not used excessive force when a trespasser died of a cardiopulmonary arrest shortly after being forcibly arrested by three officers. *Id.* at 1105. The trespasser had been excitedly wielding a pen as a weapon; the officers verbally ordered him to drop the pen; and when he refused, the officers wrestled him to the ground and handcuffed him. *Id.* Throughout the struggle, he kept shouting that he couldn't breathe but continued to fight the officers. *Id.* When the officers finally handcuffed him, they discovered that he was not breathing and were unable to resuscitate him. *Id.* The cause of death was determined to be a heart attack caused in part by a preexisting heart condition; it was also determined that he had not been choked in the struggle. *Id.*

The district court dismissed the claims against the officers on the basis of qualified immunity, and the Ninth Circuit affirmed, noting the trespasser's reported behavior prior to the officers' arrival, his erratic behavior throughout the confrontation, his repeated refusal to drop the pen, his resistance when they tried to disarm him, the officers' resorting to physical confrontation only after verbal requests, and the lack of evidence that the officers struck the trespasser or used weapons. 523 F.3d at 1106–07. The court concluded:

> Accordingly, although the confrontation came to a tragic end, we must conclude that the officers did not use excessive force. The severity of [the trespasser's] trespass and of the threat he posed were not overwhelming, but we are satisfied that the force used by the officers was proportionate to both. The Fourth Amendment does not require more. *See Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994) ("Police officers ... are not required to use the least intrusive degree of force possible ... [T]he inquiry is whether the force that was used to effect a particular seizure was reasonable.").

*Id.*

Here, Officer Miller had been called to the scene because of the accident, not because of Dr. Arshad's presence, and nothing appeared to be out of the ordinary upon his arrival. However, the situation escalated quickly as soon as Officer Miller asked Dr. Arshad to present her credentials. It is clear that Officer Miller first attempted to rely on verbal orders, but Dr. Arshad repeatedly refused to comply by presenting her credentials, refused to step away from the boy, continued to assert that it was her scene, and grew increasingly agitated. Only then did Miller attempt to arrest her simply by pulling her away by her arm, but she physically resisted arrest. In light of Dr. Arshad's behavior and her resistance to less forcible methods, it was not objectively unreasonable to use a forcible takedown to effect her arrest. That is especially true in light of the fact that she sustained, at most, only minor scrapes and bruises in the takedown

11

itself and, unlike in *Gregory*, showed no signs of cardiopulmonary arrest—even shortness of breath—during or immediately after the struggle.

The district court correctly concluded that Officer Miller's use of force was not excessive under the Fourth Amendment and that his actions were not objectively unreasonable. Accordingly, Officer Miller and all other individual defendants are entitled to qualified immunity on the excessive force claim.

*Deliberate Indifference*

The Arshads assert deliberate indifference claims under the Eighth and Fourteenth Amendments for Dr. Arshad's post-arrest death following her cardiopulmonary arrest. It is clear that deliberate indifference claims are available under the Eighth and Fourteenth Amendments even to pretrial detainees like Dr. Arshad, but the state actor's "liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc). "[T]he correct legal standard is not whether the . . . officers 'knew or should have known,' but whether they had gained actual knowledge of the substantial risk of [serious harm] and responded with deliberate indifference." *Id.*

The Arshads have presented no evidence that the officers actually knew of her heart condition (indeed, it appears that no one, including Dr. Arshad, knew of the condition) or that she was having any problems breathing or with chest pain after being handcuffed. Though there is some dispute as to her exact behavior, there is no question that she was able to breathe, talk, and walk immediately after being handcuffed. Thus, there is no indication that the officers knew based on Dr. Arshad's actual behavior that there was any substantial risk of serious harm; she showed no such indications.

12

The Arshads argue that the Kenner Police Department's Operations Manual is sufficient to show subjective knowledge of a substantial risk of serious harm because it contains statements instructing officers not to place prisoners "in a hot or closed up vehicle"; to allow an arrestee to regain his or her breath "[i]n situations involving extreme physical exertion"; and "not [to] leave the prisoner unattended in a closed vehicle . . . ." These provisions are insufficient to show the requisite subjective knowledge. This is especially true given that the temperature was approximately 65 degrees Fahrenheit (and thus reasonably comfortable) at the time of the incident, and Dr. Arshad was in no apparent distress immediately following her arrest.

The district court properly concluded that the individual defendants had not been deliberately indifferent in violation of Dr. Arshad's Eighth and Fourteenth Amendment rights, and their actions were not objectively unreasonable. Consequently, the individual defendants are entitled to qualified immunity on the deliberate indifference claim.

## Monell *Claim*

The Arshads also assert a § 1983 claim, under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), that the City had a custom or policy of arresting physicians at the scene of an accident. Because "governmental entities are not entitled to qualified immunity," we would ordinarily need to determine first whether Dr. Arshad's constitutional rights were actually violated. *Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404, 436 (5th Cir. 2008). Here, however, the district court did not make a specific determination as to whether the arrest was unconstitutional, nor must we, because, even if we assume a constitutional violation, the Arshads fail to present sufficient evidence of a custom or policy by the City to support a *Monell* claim.

> It is well established that governmental liability under § 1983 must be premised on a government policy or custom that causes the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A policy may be a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). A custom is shown by evidence of a persistent, widespread practice of government officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents government policy. *Id.*

*Id.*

It is clear the Arshads cannot show that there was a custom because they have failed to show "a persistent, widespread practice" of false arrests by the City. *Id.* The Arshads point to only one similar previous incident: In 2000, Kenner Police officers pepper-sprayed, arrested, and removed from the scene one Dr. Abdallah while he was tending to the victim of an accident he witnessed.

Other than the Dr. Abdallah incident, the only evidence the Arshads submit to show a policy is a letter from Police Chief Congemi to Fire Marshal Michael Zito on June 20, 2003. In that letter, after noting that East Jefferson General Hospital EMTs "have superior knowledge of to whom they should then surrender responsibility" at accident scenes, Congemi stated that "we have arrested licensed doctors who have attempted to interfere with [EMTs] . . . [and] will continue to do so in order to protect the victims and technicians."

The Arshads concede that there was nothing in the City's official policy manual suggesting that this was the City's official policy, and they have produced no testimony to that effect, but they argue that the Congemi letter and the Dr. Abdallah incident are sufficient to show a de facto policy. As a matter of law, this evidence, without more, is insufficient to demonstrate a policy or custom so as to make out a *Monell* claim.

14

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

> Causation bears on implementing the rule against attributed liability under § 1983, insisting as it does that the local government unit itself be the actor. . . . It follows that when the claim is that while a municipal policy itself did not violate federal law, it caused another actor to inflict the injury, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (footnotes and internal quotation marks omitted).

Here we have the type of situation envisioned by *Victoria W.*, where "the [alleged] policy itself did not violate federal law [but] caused another actor [Officer Miller] to inflict the injury," so we must apply "'rigorous standards of culpability and causation.'" 369 F.3d at 482 (quoting *Bryan County*, 520 U.S. at 405). The Arshads have produced no evidence showing that Officer Miller knew of the letter or had other knowledge of a policy of illegally arresting licensed physicians. That failure is fatal to the causation element of their *Monell* claim. *See, e.g.*, *Batista v. Rodriguez*, 702 F.2d 393, 399 (2d Cir. 1983) ("[T]he record before us . . . contains no proof of causation, i.e., that the police officers were executing a City policy. . . . [T]here is no evidence in the record furnished to us that [the] officers . . . knew of [prior] incidents or were aware of any City policy condoning police violations of civil rights."). There is simply nothing to show that Officer Miller acted pursuant to City policy, and to hold the City responsible for his actions would impose *respondeat superior* liability for Officer Miller's

actions—a result barred by § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

Because the Arshads have presented no evidence showing that the City was the "moving force" behind the alleged constitutional violations, *Bryan County*, 520 U.S. at 404, we are satisfied that the district court correctly concluded the Arshads presented insufficient evidence of a custom or policy under *Monell*, a necessary predicate to visit liability on the City.

### *State Law Claims*

The district court had subject matter jurisdiction over the Arshads' § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Section 1367(c)(3) specifically provides: "(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if — . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ." Such a decision is subject to review only for abuse of discretion. *Priester v. Lowndes County*, 354 F.3d 414, 425 (5th Cir. 2004). Because we find that the district court did not err in dismissing the Arshads' federal claims with prejudice, we also find that the district court did not err in declining to exercise supplemental jurisdiction over the related state law claims. We affirm the dismissal without prejudice of those claims.

## **CONCLUSION**

For the above reasons, the district court's judgment is affirmed.

AFFIRMED.