IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-30301
_____

JAMES J. SIBLEY, SR.,

Plaintiff - Appellant-Cross-Appellee,

versus

RAYWOOD J. LEMAIRE, Sheriff;
HUBERT P. TRAHAN; FREDDIE NOLAN,

Defendants - Appellees-Cross-Appellants.
_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

August 24, 1999

Before REAVLEY, JOLLY, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

James J. Sibley appeals the dismissal of his claims that officers operating the Vermillion Parish Correctional Center ("prison") were liable for horrible injuries he inflicted on himself while a pretrial detainee. Sibley was arrested for assault and battery. He underwent a psychotic episode while being detained in an isolation cell. During this psychotic episode he physically blinded himself by plucking out his eyes. For this injury, he sued the sheriff, chief deputy, and a deputy under both 42 U.S.C. § 1983 and Louisiana negligence claims. He won a jury verdict. The defendants then moved for a judgment as a matter of law ("JML") or new trial. The district court initially denied the motions, but then reconsidered in the light of two newly released opinions and

granted a new trial. The defendants then moved for summary judgment. The district court granted the motion for summary judgment on the § 1983 claims and dismissed without prejudice the remaining state claims. Sibley appeals the district court's rulings and the judgment dismissing his complaint. The defendants cross-appeal, arguing that the district court should have granted a JML instead of a new trial and that they were entitled to a JML on the state negligence claims. Finding no error on the part of the district court, we affirm.

I

As we have indicated, this case involves the particularly bizarre and shocking injuries Sibley inflicted upon himself during a psychotic episode while detained at the Vermillion Parish Correctional Center. Sibley was arrested on November 22, 1990, when the sheriff's department responded to a complaint made by Sibley's father-in-law. At the time he was arrested, his relatives pressed charges but requested that the charges be dropped as soon as he received medical attention. At that point, Sibley had developed severe psychological problems, which were exacerbated by his not taking prescribed medication. It is unclear the extent to which the sheriff's department was informed of his history of mental problems.

At the correctional center, Sibley was placed in a holding cell and then, after erratic behavior, he was placed in an isolation cell. Sibley could only be observed by looking through

2

a slot in the door. There was no closed circuit camera in the room. The district court concluded at trial that there was evidence that Sheriff Lemaire, who was in charge of the correctional center, had a policy of placing violent prisoners in the isolation cell and, if necessary, placing them in shackles. There was also evidence that prisoners with mental problems who exhibited violent behavior were not treated differently from other violent prisoners. The evidence at trial further shows that Lemaire instituted a policy whereby prisoners in isolation cells were to be checked every ten to fifteen minutes.

The Parish Coroner, Dr. Ardley Hebert, examined Sibley on November 23, and concluded that he should be transferred to Acadiana Mental Health ("AMH"). Because AMH did not have any available beds, Dr. Hebert put Sibley on the waiting list and left him at the correctional institute.

On November 24, Deputy Nolan notified the correctional center's nurse that Sibley needed to see a doctor. Dr. Brian Amy, who was taking calls for Dr. Hebert, examined Sibley and also concluded that he should be transferred to AMH. Again, there were no beds available and Dr. Amy therefore left Sibley on the waiting list. During his visit, Dr. Amy filled out a Physician's Emergency Commitment form ("PEC").

Dr. Amy's notes on the PEC are telling. He noted that Sibley could be having delusions. In the section querying whether the patient is homicidal, suicidal, or violent, Dr. Amy wrote, "patient

3

not violent on exam, did get arrested for battery." In dictated notes from his visit, Dr. Amy further noted: "I was called to see patient at the jail for grossly bizarre behavior. On arrival, patient was pacing around his cell reading an upside down Bible with photographs lined up on the bed like he was holding services. Patient had a very bizarre affect." In a handwritten note at the bottom of the copy of Dr. Amy's typewritten, dictated notes, he wrote in hand: "He is on the list at Acadiana Mental Health & really needs to go there."

Dr. Amy left with instructions that he should be called if necessary. Sibley concedes that, up to that point, "[a]lthough [his] conduct was strange and indecorous, there was no suggestion of any potentially self-harming behavior prior to or during Dr. Amy's visit."

Throughout this time period, Sibley's behavior was erratic--he was observed holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, and lying next to his toilet and staring into it. On Sunday, November 26, Sibley was found kicking the door to his cell. There is a factual dispute about what happened after that. Because of the procedural posture of this case, we present the facts in the light most favorable to Sibley's arguments. The testimony provides the basis for concluding that Sibley was placed in leg shackles and that the shackles were left on him until the evening of Monday,

4

November 27.[1]  The reason for placing Sibley in shackles was either to punish him for disruptive behavior or to prevent him from hurting himself.

On Monday, November 27, a deputy discovered that Sibley had urinated on himself and his mattress, thrown his food around, and thrown his Bible and family pictures into the toilet.  He was removed to another cell while his cell was cleaned.  He was offered a shower but declined one because he apparently believed the devil would come up through the drain.  He was then placed back in his cell and left there shackled and nude.  A deputy testified that he checked on him at 9:15 p.m. and observed him sitting on his bed chanting.  At 9:30 p.m. that evening, the same deputy discovered him plucking his eyes out with his fingers.

There was a delay of approximately an hour before Sibley was transported to a hospital.  Deputy Nolan indicated that he believed he needed to speak to Dr. Amy before Sibley was moved and that his efforts to reach him were the cause for the delay.  When Sibley was admitted to the hospital, his left eye was completely ruined and his right eye was severely damaged.  He has not recovered any sight in his right eye.

The evidence at trial did not link either Lemaire or Trahan to any actions taken with respect to Sibley.  Furthermore, there is no evidence in the record that anyone communicated to Lemaire

---

[1]Sibley has not alleged a constitutional violation based on being kept in shackles.  Nor is there any evidence that Sibley suffered any injury because of the use of shackles.

5

information that might lead them to think that Sibley posed a risk to himself.  Nor did Lemaire issue any orders with respect to how Sibley should be treated.  Lemaire can therefore only be held responsible for policies that may have led to Sibley's self-mutilation.  Similarly, Trahan can only be held responsible for either a policy or his failure to properly supervise the deputies handling Sibley.

With respect to Nolan, there is no evidence that he did anything that physically exacerbated Sibley's condition.  Although he did put Sibley in shackles, there is no evidence that the shackles, in and of themselves, brought about Sibley's psychotic episode.  Besides applying the shackles to Sibley, Nolan did nothing else that could have had any physical effect on Sibley.  There is, however, evidence that he observed Sibley's apparently worsening condition without calling Dr. Amy for additional medical consultation.  He therefore can only be liable for neglecting to seek additional medical help for Sibley, in the light of Sibley's increasingly erratic conduct--conduct which arguably led Nolan to shackle Sibley to protect himself from himself.

## II

Sibley first filed a claim for damages under 42 U.S.C. § 1983 against Sheriff Lemaire in federal district court in 1990.  He asserted that Sheriff Lemaire was responsible for the Vermillion Parish Jail and that Sibley had been denied psychiatric care in violation of the Fourteenth Amendment.  He also filed claims in

state court asserting negligence claims under Louisiana Civil Code articles 2315, 2316, and 2320 against Sheriff Lemaire and others, including Dr. Hebert, Dr. Amy, and the Vermillion Parish Police Jury.[2]  The trial in district court was held in abeyance pending the state court proceedings.  By late 1994, all state court actions against Dr. Hebert, Dr. Amy, and the Police Jury had been dismissed with prejudice.[3]

In 1996, Sibley amended his complaint in district court.  In part, the amended complaint alleged that there was a persistent, widespread practice that amounted to a policy of using isolation cells and shackles against patients with mental problems. According to the amended complaint, that policy violated Sibley's right to substantive due process.  The complaint also alleged that Lemaire failed to provide constant observation of mental patients or to train the prison staff to recognize symptoms of serious mental illness.  Sibley's amended complaint also added Chief Deputy Hubert Trahan and Deputy Nolan as defendants.  Sibley also successfully moved to consolidate the Louisiana state claims with the § 1983 claims.  The case was tried to a jury in September 1996.

Thus, the federal trial proceeded against Sheriff Lemaire and his two deputies Trahan and Nolan.  At the close of Sibley's

---

[2]In the state court there were a number of medical review panels that were convened pursuant to Louisiana's Medical Malpractice Act, La. R.S. 40:1299.41 et seq.

[3]Dr. Hebert was removed from the suit because he was bankrupt, Dr. Amy prevailed on the merits, and the Vermilion Parish Police Jury settled.

evidence, Lemaire moved for a JML under Fed.R.Civ.P. Rule 50(a), in part requesting dismissal of the policymaker claims. The district court held that the written and/or customary policy of using the isolation cell for disruptive inmates, including mentally ill inmates, was not unconstitutional on its face but could nonetheless be unconstitutional as applied. The district court concluded that whether there was a policy that was unconstitutional as applied was a matter for the jury to decide and deferred ruling on the motion. At the close of testimony, Lemaire again renewed his motion and the district court again deferred ruling. At that time, Trahan and Nolan moved for a determination of qualified immunity. The district court deferred ruling on the motion.[4]

The jury decided in Sibley's favor with respect to Chief Trahan and Sheriff Lemaire on the § 1983 claims. The jury found that Nolan was not liable under the § 1983 claims. The jury further decided in Sibley's favor with respect to all of the defendants on the Louisiana negligence claims. The jury found that Lemaire helped "develop a governmental custom, policy, ordinance, regulation or decision that violated . . . Sibley's constitutional rights." The district court entered judgment on March 7, 1997. On June 19, 1997, the district court denied Lemaire, Trahan, and Nolan's rule 50 and rule 59 motions.

---

[4]On November 27, 1996, the trial judge denied Trahan's motion for a JML on the basis of qualified immunity, concluding that a jury could reasonably conclude that Trahan reacted with deliberate indifference to Sibley's worsening condition.

On March 17, 1997, the defendants filed a post-trial motion for a JML or for new a new trial or remittitur.  On June 19, 1997, the district court granted a new trial based on our en banc decision in Scott v. Moore, 114 F.3d 51 (5th Cir. 1997), and on a recent Louisiana Supreme Court decision, Keith v. United States Fidelity & Guaranty Co., 694 So.2d 180 (La. 1997).  The defendants then moved for summary judgment on the § 1983 claims in the subsequent proceedings, and the district court granted the motion, dismissing the state claims without prejudice.

                              III

At the outset, we note that resolving this appeal is greatly complicated by the quite unusual procedural posture of the case. The case went through a complete trial at the end of which the district court granted a motion for a new trial (denying a motion for a judgment as a matter of law in the process) only to then grant summary judgment.  Both sides now take full advantage of the lengthy procedural history of the case to point out numerous perceived errors along the way.  Sibley argues that the district court erred by granting a new trial or, failing that, by granting the motion for summary judgment that finally terminated the case. The defendants argue that the district court erred in failing to grant its various motions for judgment as a matter of law, for permitting various errors during the course of the trial, and in not also granting summary judgment on grounds other than those the district court did rely on in disposing of the case.

We address only those issues necessary to resolve this case as expediently as possible. Those issues are: (1) whether the district court erred in granting the defendant's motion for a new trial; (2) whether the district court erred in granting summary judgment for the defendants on the § 1983 claims; and (3) whether the district court abused its discretion in dismissing the remaining state claims without prejudice. We hold that the district court did not err in granting a new trial. A Fifth Circuit en banc opinion and a Louisiana Supreme Court opinion mandated a new trial with respect to the § 1983 and state negligence claims. We also find that, although a new trial was mandated, the district court did not err when it denied the defendant's motion for judgment as a matter of law. We further hold that the district court did not err in granting summary judgment for the defendants on the § 1983 claim. Finally, having concluded that a new jury trial was necessary and that no federal questions remained, the district court did not err in electing not to exercise pendent jurisdiction.

IV

The first issue we address is whether the district court erred in granting a new trial. Under Fed.R.Civ.P. 59(a), the district court has authority to grant a new trial "to all or any of the parties and on all or part of the issues . . . for any of the reasons for which new trials have heretofore been granted in

10

actions at law in the courts of the United States."  We review the

district court's decision for abuse of discretion:

> Courts do not grant new trials unless it is reasonably
> clear that prejudicial error has crept into the record or
> that substantial justice has not been done, and the
> burden of showing harmful error rests on the party
> seeking the new trial.  Ultimately the motion invokes the
> sound discretion of the trial court, and appellate review
> of its ruling is quite limited.

Del Rio Distributing, Inc. v. Adolph Coors Co., 589 F.2d 176, 179

n.3 (5th Cir. 1979) (quoting 11 Wright & Miller, Federal Practice

& Procedure § 2803, at 31-33 (3d ed. 1973)).

To determine whether the district court abused its discretion,

we must address whether it was error to grant a new trial with

respect to each of Sibley's principal claims--the § 1983 claim and

the state negligence claims.  With respect to the state negligence

claims, we assess first whether there is any basis for disturbing

the jury verdict and, then, if we find such a basis, whether it was

more appropriate to grant a new trial or simply grant the

defendants' motion for a JML.  We thus turn to our analysis of

these issues.

A

Sibley asserted a somewhat confusing § 1983 claim at a time

when our law on the subject was less than clear.  Sibley's claim

was that the defendants were responsible for perpetuating a policy

that denied mentally disturbed patients reasonable medical care.

After a lengthy review of the record, our best formulation of their

claim is as follows: There was evidence that the officers in the

prison routinely used the isolation cell and shackles to restrain violent prisoners. As a result, the guards did not distinguish between sane and mentally ill prisoners. By failing to do so, the guards hampered their ability to assess whether the condition of a prisoner who was mentally ill was worsening. According to Sibley, this policy--uniform treatment of all violent prisoners--is not reasonably related to a legitimate government goal.

The district court expressed considerable skepticism about whether Sibley's theory amounted to a constitutional violation. However, holding that it was bound by a recent Fifth Circuit opinion, Scott v. Moore, 85 F.3d 235 (5th Cir. 1996), the district court concluded that the question of whether a prison policy was reasonably related to a legitimate government objective was a factual question for the jury to decide.

After the district court entered judgment, we issued our en banc opinion in Scott v. Moore, 114 F.3d 51 (5th Cir. 1997). In that opinion, we made it clear that in a case such as Sibley's, the appropriate analysis was not whether the conditions of confinement were responsible for Sibley's injuries. Rather, his case should be examined as an "episodic act or omission" case:

> In an "episodic act or omission" case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.

12

Id. at 53.  With respect to an "episodic act or omission" case, we had previously established that the plaintiff must show that an official acted with subjective deliberate indifference.  To hold superiors liable, the plaintiff must then show that "the employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights."  Id. at 54 (quoting Hare v. City of Corinth, 74 F.3d 633, 649 n.4 (5th Cir. 1996)).

In the light of our en banc decision, the district court therefore correctly concluded that, in this case, it was error to submit the amorphous question of whether the prison's policy was reasonably related to a legitimate government objective to a jury.  Instead, the court first had to determine that, based on the record before it, a specific employee had acted with deliberate indifference to Sibley's medical condition.  We therefore find no error in the district's court's conclusion that this error required a new trial on the § 1983 claim.[5]

B

---

[5]Because we find that the district court did not err in subsequently granting summary judgment, the issue of whether the district court erred when it denied the defendants' various motions for judgment as a matter of law with respect to the § 1983 claims is mooted.  Regardless, given the unique facts of this case, the judge's decision to grant a new trial was reasonable.  Our en banc opinion in Scott reshaped the court's analysis of the case, and it is understandable why the judge would choose to provide the parties a further opportunity to brief the issues in the light of Scott prior to ultimately ruling on them.

13

The district court granted a new trial with respect to the state negligence claims because it concluded that, under La.Civ.Code art. 2323, as amended, it had erred when it did not instruct the jury to quantify the fault of the doctors (who were not defendants in the federal case but who were sued, along with the defendants here in the state case).  In its earlier ruling on the issue, the court relied on the Louisiana Supreme Court's holding in Cavalier v. Cain Hydrostatic Testing, Inc., 657 So.2d 975 (La. 1995), to conclude that the jury need not quantify fault to non-parties.

After the decision in Cavalier was announced, the Louisiana legislature passed an amendment to art. 2323 in the 1996 Extraordinary Legislative Session of the Legislature requiring a determination of "the degree or percentage of fault of all persons causing or contributing to the injury, death or loss."  In Keith v. United States Fidelity & Guarantee Co., 694 So.2d 180 (La. 1997), which was issued after the final judgment was entered in this case, the court held that the amendment to art. 2323 is procedural in nature and therefore should be applied retroactively.

In the light of Keith, it is apparent that the district court, through no fault of its own, incorrectly refused to permit the quantification of fault among the doctors.  On appeal, Sibley argues that actions involving the doctors have already been tried and absolved of fault in state court and that the district court should therefore be collaterally estopped from assigning fault to

14

the doctors in this lawsuit. Sibley is correct that Dr. Amy has been absolved of any wrongdoing in this matter and it would therefore be inappropriate for the jury to assess whether he is at fault. With respect to Dr. Hebert, however, there was no determination that Dr. Hebert was not in part responsible for Sibley's injuries. It was therefore not error on the part of the court to grant a new trial.

The defendants argue that instead of granting its motion for a new trial, the district court should have granted their motion for a JML, because there is no legal cause in fact. Their argument is essentially that, given the extreme nature of the injuries suffered here, there is no way that the result could be legally caused by the guards neglecting a duty. This conclusion is not altogether clear. The relevant duties here are the duty to provide reasonable medical care and the duty protect the detainee from foreseeable harm.[6] In this case, the defendants arguably failed in that duty when they did not make a follow-up call to either Dr. Hebert or Dr. Amy, despite Sibley's apparent worsening condition. If, in those circumstances, they breached either duty, the harm

---

[6]A corollary to the defendants' argument that the defendants' action did not proximately cause Sibley's injuries is that the harm was not foreseeable. However, unlike the fact pattern in the now famous case of Palsgraf v. Long Island R. Co., 248 N.Y. 339 (N.Y. 1928), where the type of harm that occurred was completely unforeseeable, in this case, it was not the type of harm--self-inflicted injuries--which was unforeseeable but rather the extent of the harm. It is a well established principle of tort law that, if a defendant has breached a duty of care, the defendant must "take his victim where he finds him." E.g. Perniciaro v. Brinch, 384 So.2d 392, 395-96 (La. 1980).

15

that resulted, although perhaps unexpected and far more damaging than usual, would fall within the kind of harm from which the defendants would have had a duty to protect Sibley.

V

We turn next to the issue of whether the district court erred in granting summary judgment. As we explained in our en banc opinion in <u>Scott</u>, in order to make out a § 1983 claim, Sibley must first show that the deputies (Nolan and Trahan) acted with deliberate indifference. It is well settled that "negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." <u>Hare v. City of Corinth, MS</u>, 74 F.3d 633, 645 (5th Cir. 1996). Instead, a plaintiff must establish that an official acted with deliberate indifference. In <u>Hare</u>, <u>id.</u> at 648, we adopted the same deliberate indifference standard for pretrial detainees as the one articulated by the Supreme Court in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), for convicted prisoners:

> It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.
> That does not, however, fully answer the pending question about the level of culpability deliberate indifference entails, for the term recklessness is not self-defining. The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.

<u>Id.</u> at 836. Under our deliberate indifference standard, then, it is not enough to demonstrate that Nolan and Trahan were negligent

16

in not calling Dr. Amy when Sibley's condition appeared to worsen. Instead, Sibley must show that Nolan and Trahan were either aware or should have been aware of an unjustifiably high risk that Sibley would hurt himself and failed to act.

Having reviewed the record, we find that, although it is possible that Nolan and Trahan's activity could amount to negligence, there is no evidence that their actions were so reckless as to amount to deliberate indifference. Nolan and the other deputies under Trahan's care monitored Sibley and attempted to care for him when he started kicking the door. Although Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself.[7] The record does clearly establish that Sibley's actions in blinding himself are highly unusual and unpredictable, even for someone suffering a psychotic episode. The district court did not err in concluding that none of the prison officials acted with deliberate indifference with respect to Sibley. Having concluded that none of the guards acted with deliberate indifference, their actions are objectively

---

[7]We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call Dr. Amy in the light of Sibley's worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley.

17

reasonable and the prison officials are entitled to qualified immunity. Sibley's § 1983 claim therefore fails.

VI

We turn finally to whether the district court erred in dismissing the state claims without prejudice. A district court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it had pendent jurisdiction. 28 U.S.C. § 1367(c)(3). We review such decisions for abuse of discretion. Wong v. Stripling, 881 F.2d 200, 204 (5th Cir. 1989). In this case, both federal and state courts had engaged in lengthy proceedings regarding the alleged facts of this case. At the point that the district court granted summary judgment on the § 1983 claims, there remained the need for a full-blown jury trial on the state negligence claims. We find no abuse of discretion in the district court's decision not to conduct that trial in federal court.

VII

This case presents a particularly contorted procedural history. Having carefully reviewed the record, we conclude that the district court correctly recognized that new case law mandated a new trial and acted accordingly. Having reached that decision, the district court provided both sides an opportunity to argue the applicability of the law as set forth in our opinion in Scott to the case at hand, before finally ruling that the defendants were entitled to summary judgment on the § 1983 claims, and that the

18

remaining state negligence claims should be dismissed without prejudice. Finding no error on the part of the district court, we

A F F I R M.