# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 7, 2008

Charles R. Fulbruge III
Clerk

No. 07-10589

KENNETH ANDERSON, Individually and As Representatives of the Estate
of Kendrick Deshun Baines, Deceased; REGINA BROWN, Individually and
As Representatives of the Estate of Kendrick Deshun Baines, Deceased

Plaintiffs - Appellants

v.

DALLAS COUNTY TEXAS

Defendant - Appellee

Appeal from the United States District Court for the
Northern District of Texas, Dallas
3:05-CV-1248

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Plaintiffs Kenneth Anderson and Regina Brown appeal the district court's
summary judgment dismissal of their claims for (1) improper denial of medical
treatment to Kendrick Deshun Baines under 42 U.S.C. § 1983, and (2) the
negligent provision of clothing and other items to Kendrick Deshun Baines in

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

violation of the Texas Tort Claims Act, TEXAS CIV. PRAC. & REM. CODE ANN. § 101.021. For the reasons stated below, we affirm the district court's judgment.

## I. BACKGROUND

Plaintiffs Kenneth Anderson and Regina Brown filed this action on behalf of themselves and the estate of their deceased son, Kendrick DeShun Baines. Baines committed suicide on July 24, 2003, while incarcerated in the Dallas County Jail (the "Jail"). Baines was booked into the Jail on July 11, 2003, on charges of resisting arrest, possession of marijuana, and driving without a helmet. At book-in, Baines indicated that he had no medical problems, and he had no observable injury or impairment that required medical attention. Baines was assigned to the Kays facility, a minimum-security division of the Jail. Baines's pre-trial confinement at the Kays facility was uneventful, and, on July 17, 2003, he was convicted and sentenced to imprisonment. Baines was eligible for release on July 29, 2003.

However, on July 23, 2003, the day before his death, Detention Service Officer ("DSO") Brandon heard Baines threaten to kill himself unless he was allowed to see his mother. In response to this threat, DSO Brandon took Baines to the nurse's station, where he was examined by Nurse Hill. Nurse Hill said "she would place [Baines] on suicide watch and transfer him to closed behavioral observation 03P01." Baines was placed on suicide watch from the time he saw Nurse Hill until approximately 6:00 p.m. that evening. A "suicide log" was kept to record the fact that he was observed at regular intervals. An "incident report" created by DSO Brandon at 6:22 p.m. also indicated that Baines had expressed a suicidal intent. However, in violation of Jail policy, no formal order medically authorizing the Jail officials to take suicide precautions was ever completed.[1]

---

[1] If a doctor places an inmate on Suicide Prevention Status, a "Medical Authorization for Suicide Precautions" form is to be completed and signed by the doctor. A copy of the Medical Authorization must be attached to the inmate's "buffcard," which is itself attached to the inmate's file. Once an inmate is placed on Suicide Prevention Status, jailers must

At around 6:00 p.m., Baines was transferred to the third floor of the West Tower of the Lew Sterrett Justice Center ("West Tower"), a division of the Jail designated as a behavioral observation facility. The third floor of the West Tower mainly held mentally ill patients, although other inmates were sometimes housed there due to overflow problems or because they were "troublemakers." Baines arrived at the West Tower and was brought to the third floor at approximately 8:40 p.m. A buffcard was delivered along with Baines, but it did not contain the words "suicide" or "suicidal" on it as was customary for suicidal inmates. Moreover, neither the incident report created at the Kays facility, which indicated that Baines had expressed suicidal intentions, nor the suicide log accompanied Baines to the third floor.

As a result, DSO Huff, who was working at the control center when Baines arrived, was unaware that Baines had expressed an intent to commit suicide. He did notice that Baines arrived without a mattress or bed roll, but assumed that there were simply no mattresses or bed rolls available. Accordingly, DSO Huff assigned Baines to a single cell with the jail-issued jumper Baines would later use to kill himself. Later that evening, around 11:45 p.m., a female officer from the Kay's facility delivered DSO Brandon's incident report, along with the "suicide log," to the West Tower's third floor. DSO Teves received the report and attached it to Baines's buffcard. DSO Teves claimed that he never read it.

The second watch, or shift, at the West Tower began at 6:00 a.m. on July 24, 2003, and ended at 2:30 p.m. DSOs Strange, Terry, and Vannucci were assigned to the third floor. In addition, two physician assistants, Judd and

---

routinely monitor and observe the inmate, and the inmate is to be confined without items that he can use to take his own life, such as a jail-issued jumper, mattress, bedroll, blankets, socks and eating utensils. In lieu of a cloth jumper, suicidal inmates are provided with paper drapes that tear too easily for inmates to use to harm themselves with.

Cotten, from the University of Texas Medical Branch at Galveston ("UTMB"),[2] were assigned to evaluate mentally ill inmates in the West Tower. Both Judd and Cotten were aware that Baines was suicidal, but both also stated that they were unaware that the Jail had failed to undertake necessary suicide precautions. The physician assistants claimed that they requested to see Baines at 9:00 a.m. and 11:00 a.m., but were unable to obtain an escort from the DSOs, and decided not to proceed without one. The DSOs could not recall refusing an escort. In either event, Jail policy permitted the physician assistants to proceed without an escort; however, without an escort, the physician assistants could only communicate with the inmates through the cell doors. Both Judd and Cotten preferred to evaluate a patient with an escort because they were able to open the door to the inmate's cell and communicate more directly with him.

Around 11:00 a.m. on the morning of July 24, 2003, DSO Terry realized that Baines did not have a mattress or bedroll. This indicated to Terry that Baines might be suicidal. Accordingly, Terry notified DSO Strange, who checked Baines's paperwork and learned that Baines was suicidal. Upon learning this, DSO Strange asked Judd to see Baines. Judd, unaware that Baines was never placed on suicide precautions, indicated that she would return about 12:30 or 1:00 p.m. to see Baines. At about 1:10 p.m., Judd went to the third floor control center, and DSO Strange asked if she was ready to see Baines. Judd responded that she had a list of other inmates whom she and Cotten wanted to see first. This response did not make sense to Terry. Terry, therefore, checked on Baines multiple times while Judd was seeing other prisoners.

---

[2] The defendant contracted with UTMB for the provision of medical and mental health care services to inmates confined in the Jail. Under the "Interlocal Agreement to Provide Medical Services," dated October 29, 2002, UTMB was the sole provider of medical services to inmates of the Jail. UTMB agreed to provide medical services to inmates in accordance with the standards of care established by the American Correctional Association, the Texas Commission on Jail Standards, and the Texas Department of Protective and Regulatory Services.

After Judd finished visiting other prisoners on the third of floor of the West Tower, at about 2:00 p.m., she returned to the control room where the DSOs were eating lunch. She awaited Cotten's return, who was visiting other inmates on the third floor. At around 2:10 p.m., DSO Chatman, from the third watch, who was relieving DSOs Strange, Terry, and Vannucci, escorted Judd and Cotten to see Baines. Cotten received a telephone call on his cell phone at approximately 2:11 p.m., and Judd and Chatman continued to proceed to Baines's cell. Upon arriving at Baines's cell, Judd observed blood "all over" Baines's cell and could not tell if Baines was breathing. Baines was lying face down in his cell, with his jail-issued jumper tied around his neck and what were later determined to be three plastic spoons shoved down his throat. Judd left the area to call for help and told Cotten to look in on Baines.

Shortly thereafter, Judd returned with DSO Chatman, who had radioed for supervisors and medical staff, and Dr. Gary Neller, a Jail psychiatrist, who had arrived on the floor at that moment. DSO Chatman opened the cell door and Dr. Neller entered the cell and attempted to find a pulse, which he could not. Dr. Neller also observed that Baines's body was cold. Nurses Daughety and Sanders, responding to DSO Chatman's call, also examined Baines and sought to remove the jumper from around his neck. There is no indication in the record that CPR was ever given, and the only witnesses deposed could not recall whether it was performed. Neither the physician assistants nor the DSOs performed CPR on Baines, and nothing in the record indicates that Dr. Neller or Nurses Daughtey and Sanders (who were not deposed) did either. Ultimately, Baines was taken to Parkland Hospital, where he was pronounced dead at 3:11 p.m. The next day, on July 25, 2002, the Dallas County medical examiner performed an autopsy on Baines and determined that the cause of death was self-inflicted ligature strangulation.

On June 17, 2005, the plaintiffs filed a three-count complaint against Dallas County. The plaintiffs sought damages for: (1) improper denial of medical treatment in violation of 42 U.S.C. § 1983; (2) failure to reasonably accommodate mentally handicapped inmates in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; and (3) the negligent provision of clothing and use of a jail cell in violation of the Texas Tort Claims Act (the "TTCA"), TEXAS CIV. PRAC. & REM. CODE ANN. § 101.021.

On December 2, 2006, the defendant moved for summary judgment on all counts. The defendant argued that the plaintiffs did not have standing to bring the lawsuit, could not establish a claim under the ADA and the TTCA, and could not prove that the defendant was deliberately indifferent to Baines's medical needs under § 1983 because the Jail and UTMB officials were, at most, negligent in their provision of medical care. On February 5, 2007, the plaintiffs filed a response and supporting evidence, including more than two-thousand pages of documents—consisting primarily of deposition transcripts, affidavits, and medical records for individuals not involved in this litigation—generated in another lawsuit, Mims v. Dallas County, No. 3:04-CV-2754 (N.D. Tex.).[3] The plaintiffs requested that the district court take judicial notice of the Mims documents, and attempted to rely on the documents to prove that the defendant had consistently and knowingly underfunded and understaffed the Jail to the detriment of inmates' constitutional rights. On February 19, 2007, the defendant moved to strike many of the documents filed by the plaintiffs in support of their response, including the documents generated in Mims. The plaintiffs did not respond to the defendant's objections.

---

[3] Mims was a lawsuit filed against Dallas County alleging that the defendant systematically failed to provide adequate medical care at the Jail from at least 1998 through 2006. It did not involve the suicide of an inmate, however, and was settled before going to trial.

On April 18, 2007, the district court granted the defendant's motion to strike the Mims documents. The district court ruled that it did not have authority to take judicial notice of the documents produced in Mims. The district court cited Taylor v. Charter Medical Corp., 162 F.3d 827, 829 (5th Cir. 1998), for the proposition that it could only take judicial notice of an "adjudicative fact" if the fact is not subject to reasonable dispute, in that it is: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. However, the district court concluded that the "myriad of 'facts' contained in [the Mims] documents [were] neither generally known nor reasonably indisputable."

In addition, although the district court held that the plaintiffs had standing to bring the action, it granted the defendant summary judgment on all counts. First, the district court held that the plaintiffs could not establish either an Eighth Amendment condition-of-confinement case or an episodic-act-or-omission case under § 1983. The plaintiffs could not establish a condition-of-confinement case because the defendant "had policies in place making the provision of psychiatric treatment to suicidal inmates a high priority[,]" and the plaintiffs "acknowledg[ed] 'that there was no greater priority in the routine operation of the [J]ail then to provide for the prompt treatment of a suicidal inmate who had not been yet placed on suicide prevention orders.'" Furthermore, the plaintiffs could not establish an episodic-act-or-omission case because not one single individual acted with deliberate indifference, inasmuch as the only state actors who knew that Baines was suicidal and that Baines was not placed on suicide precautions took steps to ameliorate the risk of harm to Baines. Second, the district court held that the plaintiffs could not establish a claim for disability discrimination under the ADA or Rehabilitation Act because there was no proof that Baines was excluded from benefits or services at the Jail

solely because of any alleged disability. Third, the district court concluded that the plaintiffs could not prove a TTCA claim because the defendant did not "use," within the meaning of the TTCA, any of the items that caused Baines's death.

On May 17, 2007, the plaintiffs filed this timely appeal. The plaintiffs do not appeal the district court's dismissal of the claim arising under the ADA and Rehabilitation Act.

## II. DISCUSSION

### A. Admissibility of Evidence

Before considering the merits of the case, we shall address the plaintiffs' contention that the district court erred in striking deposition testimony taken in the Mims case.[4] The plaintiffs argue that depositions taken in one case can be used against the same party in another case so long as that party was represented by counsel, and there is a substantial identity of issues. See, e.g., Nippon Credit Bank, Ltd. v. Matthews, 291 F.3d 738, 750-51 (11th Cir. 2002); Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001); Rule v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local Union No. 396, 568 F.2d 558, 568-69 (8th Cir. 1977). According to the plaintiffs, the depositions taken in Mims were admissible because: (1) the defendant was represented by counsel in Mims; and (2) both Mims and the instant case involved injuries to inmates at the Jail as a result of the defendant's deliberate indifference to inmates' physical and mental health. Lastly, the plaintiffs state that the district court need not have taken judicial notice of the Mims deposition testimony, and that, in fact, the plaintiffs merely requested that the district court take judicial notice "out of an abundance of caution and, essentially, as an afterthought."

---

[4] As noted above, in addition to deposition testimony, the district court also refused to consider affidavits and medical records that were generated in the Mims case. However, the plaintiffs do not specifically address any evidence other than the deposition testimony.

During oral argument, the plaintiffs further conceded that the district court did not have the authority to take judicial notice of the Mims documents.

A district court's decision not to consider evidence offered in opposition to a motion for summary judgment is reviewed under an abuse of discretion standard. Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999) (citation omitted). However, we need not consider whether the Mims documents were admissible in this case because the plaintiffs did not preserve their argument for appeal. This court does "not consider arguments or evidence that was not presented to the district court." Benefit Recovery, Inc. v. Donelon, 521 F.3d 326, 329 (5th Cir. 2008) (citing Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir. 1998)). There is no bright-line rule governing whether a matter was sufficiently raised below. N.Y. Life Ins. Co. v. Brown, 84 F.3d 137, 142 n.4 (5th Cir. 1996) (citation omitted). But even raising an argument is, standing alone, insufficient. Benefit Recovery, Inc., 521 F.3d at 329 (citing FDIC v. Mijalis, 15 F.3d 1314, 1327 (5th Cir. 1994)). "If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal." Mijalis, 15 F.3d at 1327 (citation omitted); see also Connelly v. Tex. Dep't of Criminal Justice, 484 F.3d 343, 346 n.1 (5th Cir. 2007) (citation omitted) (holding that citing to a case in a brief to the district court without asserting that its holding applies is not enough to preserve the issue for appeal).

Here, while the plaintiffs may have requested the district court to take judicial notice of the documents "out of an abundance of caution," the plaintiffs were responsible for framing the issue as one of judicial notice, as opposed to admissibility under the Federal Rules of Civil Procedure. More importantly, the defendant filed an objection to the evidence, and the plaintiffs neither responded

to that motion nor elsewhere explained why the evidence was admissible. Because the plaintiffs never argued that the evidence was admissible on the basis of identity of issues and parties, they cannot do so on appeal.

B. Cruel and Unusual Punishment

We review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000) (citations omitted). "Summary judgment is proper when the evidence reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." Id. (citing FED. R. CIV. P. 56(c)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Even if we do not agree with the reasons given by the district court to support summary judgment, we may affirm the district court's ruling on any grounds supported by the record." Berquist v. Wash. Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007) (citation and internal quotation marks omitted).

"There are three elements to establish liability through a Section 1983 action. There must be (1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." Victoria W. v. Larprenter, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted). "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." Baker v. McCollan, 443 U.S. 137, 146 (1979). Deliberate indifference to a prisoner's serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment is actionable under § 1983. Victoria W., 369 F.3d at 483 (citation omitted).

The Eighth Amendment's prohibition against cruel and unusual punishment imposes duties on prison officials to take reasonable measures to guarantee the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citations omitted); see Hare v. City of Corinth, 74 F.3d 633, 644 (5th Cir. 1996) (en banc) ("Whether the State's obligation is cast in terms of a duty to provide medical care or protection from harm, its ultimate constitutional duty is 'to assume some responsibility for [the] safety and general well-being' of persons whose state-occasioned confinement renders them unable to fend for themselves." (citation omitted)).[5] While the original aim of the Eighth Amendment was to proscribe inhumane techniques of punishment, the Supreme Court "has extended it to encompass 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" Victoria W., 369 F.3d at 483 (citing Estelle v. Gamble, 429 U.S. 97, 102 (1976)). It is now clear that a failure to provide adequate protection against a prisoner's known suicidal impulses is actionable. Evans v. City of Marlin, 986 F.2d 104, 107 (5th Cir. 1993) (citation omitted).

To determine the appropriate standard to apply, however, we must first classify the challenge as an attack on either a condition of confinement, or an episodic act or omission. See Flores v. County of Hardeman, 124 F.3d 736, 738 (5th Cir. 1997) (citation omitted). A condition-of-confinement action "is a constitutional attack 'on general conditions, practices, rules or restrictions'" of confinement. Id. (citation omitted). It includes claims such as where an inmate "complains of the number of bunks in a cell or his television or mail privileges . . . ." Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). If the

---

[5] Hare is a pre-trial detainee case, not a prisoner case. Id. at 635. Unlike convicted prisoners, pre-trial detainees' claims arise under the Due Process Clause; however, this court applies the same standard of review to both types of cases. Id.; see also Gibbs v. Grimmette, 254 F.3d 545, 548 (5th Cir. 2001) (citation omitted).

plaintiff complains of a condition of confinement, the court assumes that "by the municipality's promulgation and maintenance of the complained of condition, [the municipality] intended to cause the alleged constitutional deprivation." Flores, 124 F.3d at 738 (citation omitted).

Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998), is an example of a condition-of-confinement case. There, the disabled prisoner complained that he was unable to bathe for over two months because the prison did not accommodate his disability. Id. at 1024. As a result, the prisoner was forced to clean himself using toilet water, which ultimately caused a fungal infection and blisters requiring medical treatment. Id. The complained-of condition was unsanitary conditions that deprived the prisoner of a basic human need and exposed him to health risks. Id. at 1025. Another example is Burleson v. Texas Department of Criminal Justice, 393 F.3d 577, 589 (5th Cir. 2004). In that case, the prisoner complained that while working as a welder in a prisoner work program he was never warned that the welding electrodes were radioactive. Id. at 581. The court treated the claim as a condition-of-confinement case because the defendant sought to impose liability on the state for a prison practice that exposed him to carcinogens, as opposed to the actions of its officers. Id. at 589; see also Victoria W., 369 F.3d at 489 (challenging a policy that required a pregnant prisoner to receive a court order before being granted supervised release in order to obtain an abortion).

In contrast, an episodic-act-or-omission claim occurs "where the complained-of harm is a particular act or omission of one or more officials . . . ." Scott, 114 F.3d at 53 (citation omitted). In Scott, the en banc court distinguished an episodic-act-or-omission claim from a condition-of-confinement claim by explaining that:

> In an "episodic act or omission" case, an actor usually is interposed between the detainee and the municipality,

> such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.

Id.; see also Gibbs, 254 F.3d at 548 n.2 (citation omitted) (stating that the episodic act standard is applied when the alleged constitutional violation is a particular act or omission by an individual that points to a derivative policy or custom of the municipality).

Importantly, this court has not permitted plaintiffs to conflate claims concerning a prison official's act or omission with a condition-of-confinement complaint. Thus, in Flores, the plaintiffs brought a suit for failure to provide adequate mental health care against the defendants after the plaintiffs' decedent committed suicide. 124 F.3d at 737. The decedent was initially placed on suicide watch by the county sheriff who knew the decedent and felt the decedent was acting strangely. Id. However, the next day, the sheriff removed those precautions because the decedent had never threatened his own life and, in the sheriff's opinion, began to act normally. Id. The plaintiffs attempted to raise both an episodic-act-or-omission case (based on the sheriff's failure to set up special procedures to monitor against the decedent's potential suicide), and a condition-of-confinement case (based on the county's alleged failure to adequately staff and train the jail officials). Id. at 738. This court did not permit the plaintiffs to proceed under both theories. Id. Where the sheriff's actions were interposed between the county and the decedent, it was clear that the case was one for an episodic act or omission. Id.

A similar result occurred in Sibley v. Lemaire, 184 F.3d 481, 485 (5th Cir. 1999). There, a mentally-impaired inmate brought an action against the defendants after he intentionally injured his own eyes. The plaintiff claimed that the defendants were responsible for perpetuating a policy—restraining

violent prisoners with shackles—that did not distinguish between sane and mentally ill prisoners, and thereby denied mentally disturbed patients reasonable medical care. Id. at 487. If the defendants had a policy that distinguished between sane and mentally ill patients, the plaintiff claimed, the guards would have realized that his mental illness was worsening and prevented him from causing himself harm. Id. This court rejected that argument, holding that the appropriate analysis was not whether the conditions of confinement were responsible for the plaintiff's injuries. Id. Rather, the case was a claim based on an episodic act or omission—specific officers' failure to prevent the inmate from harming himself. Id. at 487-88.

In the instant case, the plaintiffs argue that they should be able to proceed under either theory. The defendant, by contrast, argues that the plaintiffs' case is an episodic-act-or-omission case. We shall first, therefore, evaluate whether the plaintiffs may proceed on a condition-of-confinement theory.

The plaintiffs claim that they can proceed on a condition-of-confinement theory because they are challenging as constitutionally inadequate the policies and customs of the Jail, namely, the: (1) funding of the Jail, (2) staffing of the Jail; (3) monitoring of Jail operations; and (4) provision of medical care at the Jail. The plaintiffs offer various items of evidence in support of their contention that the medical care provided at the Jail was inadequate, and that the defendant knew that the care was inadequate. Most of the evidence the plaintiffs focus on in their briefs in support of these allegations are documents generated in the Mims case that we cannot consider. But the plaintiffs also rely on other evidence, such as: (1) a report that was provided to the Dallas County Commissioners in 1998, the "Dallas County Jail Psychiatric Services Task Force Report," wherein it was concluded that "basic resources must be increased in order to permit a minimally sufficient standard of psychiatric care to be

delivered to inmates"; and (2) a United States Department of Justice report, following an investigation of the Jail in February and March, 2006, which concluded that inmates at the Jail had inadequate access to healthcare. The defendant does not address this evidence because it maintains that this is not a condition-of-confinement case.

We agree. The plaintiffs admit that the defendant had policies in place that, if followed, would have prevented Baines's suicide. Fundamentally, the plaintiffs assert that Baines would not have been able to commit suicide if suicide precautions had been enacted in accordance with Jail policy. The plaintiffs ultimately take issue with the DSOs' and physician assistants' failure to follow those policies and procedures. This is a classic episodic-act-or-omission case. See Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999) ("[The inmate's] complaint turns on [the officers'] alleged failure to take better care of her, . . . to medically screen her and secure her to treatment. Such a complaint perfectly fits the definition of the episodic omission."). The plaintiffs attempt to create a condition-of-confinement claim by also alleging that the individuals' failure to follow the procedures resulted from other county practices, namely, inadequate funding and staffing. But even if true, taken together, the state actors were still "interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." Scott, 114 F.3d at 53 (holding that even though the plaintiff asserted that under-staffing caused her injury, her actual complained-of harm was sexual assault, an episodic act). Because the plaintiffs cannot prove that Baines was subjected to cruel and unusual punishment without first proving that a state actor deprived him of his constitutional rights, the plaintiffs' case is an episodic-act-or-omission case.

To proceed on their § 1983 claim, then, the plaintiffs must prove that a genuine issue of material fact exists concerning their episodic-act-or-omission claim. To establish county liability for a failure to protect under an episodic-act-or-omission theory, a plaintiff must show that: (1) a county employee violated his clearly established constitutional rights with subjective deliberate indifference; and (2) the violation resulted from a county policy or custom adopted or maintained with objective deliberate indifference. Scott, 114 F.3d at 54 (citations omitted).

A prison official acts with subjective indifference if: (1) he knows that an inmate faces a substantial risk of serious bodily harm; and (2) he disregards that risk by failing to take reasonable measures to abate it. Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006) (citation omitted); see also Farmer, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."); Gibbs, 254 F.3d at 549 ("To prove deliberate indifference, [an inmate] must show that the state official knew of and disregarded an excessive risk to the inmate's health or safety." (citation omitted)); Sibley, 184 F.3d at 489 n.7 ("We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary [to take certain precautions]. To be deliberately indifferent, however, the deputies would have had to have chosen not [to take those precautions] with the expectation that some harm would result to [the inmate]."). Put differently, the plaintiff must show both that the employee was aware of facts from which an inference of an excessive risk to the prisoner's safety could be drawn, and that the employee actually drew an inference that

such potential for harm existed.  Bradley, 157 F.3d at 1025 (citing Farmer, 511 U.S. at 837).

Obviously, "[d]eliberate indifference is an extremely high standard to meet." Gobert, 463 F.3d at 346 (citation and internal quotation marks omitted). The Supreme Court has justified this standard by explaining that:

> An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-38.  Therefore, the Court has cautioned that "courts should be careful to ensure that the requirement of subjective culpability is not lost.  It is not enough merely to find that a reasonable person would have known, or that the defendant should have known . . . ."  Id. at 843 n.6.

If a plaintiff is unable to show that a county employee acted with subjective deliberate indifference, the county cannot be held liable for an episodic act or omission.  See City of L.A. v. Heller, 475 U.S. 796, 799 (1986); Olabisomotosho, 185 F.3d at 529; Flores, 124 F.3d at 739.  Even if an officer acted with subjective deliberate indifference, however, the plaintiff must still show that the county employee's act resulted from a county policy adopted or maintained with objective deliberate indifference to the inmate's rights.  See Scott, 114 F.3d at 54 (citations omitted); see also Evans, 986 F.2d at 108 (holding that police officer's failure to implement procedures for the safe incarceration of inmates that resulted in a prisoner's suicide did not create municipal liability).

A county acts with objective deliberate indifference if it promulgates (or fails to promulgate) a policy or custom despite "the 'known or obvious consequences' that constitutional violations would result." Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001) (citing Bd. of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997)). "In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation." Id. at 580. The policy or custom must have been the "moving force" behind the constitutional violation. Forgan v. Howard County, 494 F.3d 518, 522 (5th Cir. 2007) (citing Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)).

Here, the plaintiffs argue that the district court erred in granting summary judgment because genuine disputes of fact exist. First, the plaintiffs' assert that state actors were deliberately indifferent to Baines's medical needs because: (1) the physician assistants, Cotten and Judd, knew that Baines was suicidal and yet refused to see him in a timely manner; (2) DSOs Strange, Terry, Vannucci and Teves knew that Baines was suicidal but failed to obtain a doctor's orders authorizing suicide prevention watch; and (3) the individuals who found Baines lying on the floor and those who attended to him afterwards failed to perform CPR on him. The plaintiffs point out that if either Cotten and Judd had evaluated Baines, or if the DSOs had obtained authorization for a suicide prevention watch, the items that Baines used to kill himself would have been removed from his cell. Furthermore, according to the opinion of plaintiffs' expert, Dr. David Thomas, "[i]f CPR had been initiated at the time [Baines] was found, in reasonable certainty, Mr. Baines would be alive today."

Second, the plaintiffs assert that the state actors' failure to act reasonably was the result of the defendant's policies and practices, including the defendant's alleged policy and custom to: (1) permit mentally ill patients to remain in

custody without any mental health treatment; (2) permit mentally ill inmates to retain dangerous materials; (3) fail to timely administer medications; (4) permit mentally ill patients to be housed with clothing or other items that could be used to harm themselves; (5) delay treating mentally ill patients; (6) under-staff and under-fund the operation of the Jail; and (7) provide improper oversight and coordination of healthcare providers.

We find that the plaintiffs have not presented evidence sufficient to create a genuine issue of fact. We shall consider the undisputed facts in two parts: (1) before Baines acted to take his own life, and (2) after Baines was discovered lying on his cell floor, seemingly without a pulse.

With regard to the events proceeding Baines's suicide, we agree with the district court that the evidence does not establish that any state actor acted with deliberate indifference. The physician assistants, Judd and Cotten, could only have been aware of a substantial risk to Baines's health if they knew both that Baines was suicidal and that suicide prevention precautions had not been imposed. Neither Judd nor Cotten was aware that an excessive risk of harm existed that Baines would commit suicide because neither was aware that suicide precautions had not been taken. See Gibbs, 254 F.3d at 550 ("Because the defendants did not know of any diagnosed active cases of tuberculosis that could have infected [the inmate], they did not act with subjective deliberate indifference by refusing to administer the skin test."). In addition, while DSOs Terry, Strange, and Vannucci were aware that a substantial risk of harm existed, they did not ignore the risk of harm to Baines. The DSOs checked Baines's file after realizing that he did not have a mattress or bedroll, requested that the physician assistants evaluate Baines and periodically checked in on Baines themselves. See Olabisiomotosho, 185 F.3d at 527 (holding that the arresting officer was not deliberately indifferent to the pre-trial detainee's

19

medical needs where he informed the booking personnel of the detainee's asthma). Finally, the evidence does not show that DSO Teves knew that Baines was suicidal or otherwise knowingly ignored the risk of harm to Baines. See Gibbs, 463 F.3d at 349 (stating that the municipal employee must disregard a substantial health risk about which he knew).

While the staff at the Jail collectively may have acted negligently, or even grossly negligently, by ignoring Jail procedures, no single individual deliberately ignored an excessive risk of harm. See Gobert, 463 F.3d at 352 ("We agree that a trier of fact might find negligence . . . . However, deliberate indifference to a serious medical need could not be sustained and cannot as a matter of law support a finding of a violation of [the inmate's] constitutional right to be free of cruel and unusual punishment."); Evans, 986 F.2d at 108 (citation omitted) ("At most, these policies were not strictly followed on the night of [the decedent's suicide.] Had they been she would not have had access to the hose [she killed herself with]. The proximity of the hose to her cell may have been negligence, but the negligent act of an official will not support liability under § 1983."). Accordingly, we conclude that the Jail officials did not act with deliberate indifference in failing to prevent Baines from acting to take his own life.

Second, with regard to the alleged omissions of the state actors after Baines was found lying on the floor of his cell—namely, the failure to perform CPR—we find that there is no evidence that the omission was the result of a policy or custom of the defendant. We assume for purposes of summary judgment that CPR was never performed until paramedics arrived, and that the failure to perform CPR contributed to Baines's death. Indeed, the plaintiffs' expert, Dr. Thomas, offered the only opinion in the record on this subject, and he stated that "CPR could have revived [Baines] and allowed him to survive."

Moreover, we assume, arguendo, that the prison officials acted with subjective deliberate indifference by failing to perform CPR on Baines.

Nevertheless, we conclude that the prison officials' failure to perform CPR cannot create county liability. See Forgan, 494 F.3d at 523 (holding that municipality could not be liable where the plaintiff failed to show how a policy or lack of a policy led to the inmate's suicide). The defendant's "Medical Procedures Suicide Detection and Prevention Policy," in place at the time of Baines's death, mandated that if an inmate attempted suicide, medical authorities must be summoned immediately and "basic first aid procedures" must be initiated. Although we assume basic first procedures were not performed, this was in violation of county policy. See Evans, 986 F.2d at 108 n.6 ("The failure to follow procedural guidelines, standing alone, does not implicate constitutional liability." (citation omitted)).

Furthermore, while the plaintiffs make generalized claims that a county policy led to Baines's death, the plaintiffs never identify what specific policy was the moving force behind the Jail officials' alleged failure to timely perform CPR. See Forgan, 494 F.3d at 522 (stating that conclusory statements attacking suicide prevention policies or claiming that officers could have been better trained are insufficient). The failure to fully staff the Jail, even if true, cannot be said to be the reason CPR was not performed because the undisputed facts show that medical officials promptly responded to the discovery of Baines. The only theory that might be connected is the failure to train adequately Jail officials, but there is no evidence in the record indicating that Jail officials failed to perform CPR due to inadequate training. Nor is there evidence in the record that the defendant should have known that its training inadequately instructed its employees either how or when to perform CPR on inmates. See Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 249 (5th Cir. 2003) (holding that

21

municipal liability could not exist where the municipality did not have constructive knowledge of the complained-of custom); Thompson v. Upshur County, 245 F.3d 447, 463 (5th Cir. 2001) ("Our precedent makes clear that deliberate indifference on the part of a policymaker cannot generally be shown from a single violation of constitutional rights or expert testimony." (citation omitted)); Scott, 114 F.3d at 54 (holding that the city had no reason to know that its policy created a substantial risk of harm to female inmates because the same procedures had been followed without incident since the late 1970s). Accordingly, the alleged failure to perform CPR does not create county liability in this case.

C.  The TTCA Claims

The plaintiffs also alleged that the defendant was negligent in the use of Baines's jail-issued plastic spoons and clothing.  The plaintiffs argue that the district court erred in determining that the defendant did not "use" the items within the meaning of the TTCA because the defendant provided Baines with the items for feeding and clothing purposes.  The plaintiffs contend that this constitutes "use" for purposes of the TTCA because Baines had no choice in the items that were provided to him by the defendant.  Since the items were dangerous for a suicidal inmate to possess, the plaintiffs submit that a fact issue concerning their TTCA claim exists.

A Texas governmental unit is generally immune from tort liability. Forgan, 494 F.3d at 520 (citing Tex. Dep't of Criminal Justice v. Miller, 51 S.W.3d 583, 586-87 (Tex. 2001)).  Section 101.021(2) of the TTCA, however, waives governmental immunity for personal injury or death caused by a condition or use of tangible personal property if the governmental unit would, were it a private person, be liable to the claimant under applicable Texas law. § 101.021(2); see also San Antonio State Hosp. v. Cowan, 128 S.W.3d 244, 245

22

(Tex. 2004) (citation omitted); Evans, 996 F.2d at 108-09 (citation omitted). In evaluating a claim under the TTCA, the threshold question is whether the government's actions constituted a condition or use of personal property. Forgan, 494 F.3d at 520.

We agree with the district court that the defendant's mere issuance of the plastic spoons and clothing to Baines did not constitute a "use" of real property. In Cowan, the Texas Supreme Court held that merely providing a state hospital patient his personal property that he later used to hang himself with did not constitute a "use" of those items. 128 S.W.3d at 246-47. This court has since noted that the TTCA permits waiver of liability only "if death or injury results from (1) the direct use of property by a state actor, or (2) a defective condition of state-issued property, even if actively employed by a third-party at the time of injury." Forgan, 494 F.3d at 521. Moreover, we held that a Texas municipality does not waive its sovereign immunity when an inmate uses state-issued clothing to cause his own death, absent an allegation that the clothing was in a defective condition. Id. Because the plaintiffs did not offer evidence that the jail-issued items Baines used to commit suicide were defective, the district court correctly determined that the TTCA's waiver of sovereign immunity does not apply to this case.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment.